J-A10035-18 & J-A10046-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| GEORGE M. HADLEY | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JOEL MORANZ, INDIVIDUALLY AND AS EXECUTOR OF THE ESTATE OF ELAINE MORANZ, DECEASED AND JANA S. PALEY AND SUPERIOR MOVING & STORAGE COMPANY, INC. | : | No. 842 EDA 2017 |
| | : | |
| APPEAL OF: SUPERIOR MOVING & STORAGE COMPANY, INC. | : | |

Appeal from the Judgment Entered February 10, 2017
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  December Term, 2014 No. 001620

| | | |
|---|---|---|
| GEORGE M. HADLEY | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JOEL MORANZ, INDIVIDUALLY AND AS EXECUTOR OF THE ESTATE OF ELAINE MORANZ, JANA S. PALEY AND SUPERIOR MOVING & STORAGE COMPANY, INC. | : | No. 840 EDA 2017 |
| | : | |
| APPEAL OF: JANA S. PALEY | : | |

Appeal from the Judgment Entered February 10, 2017
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  December Term, 2014 No. 001620

BEFORE:  GANTMAN, P.J., DUBOW, J., and McLAUGHLIN, J.

MEMORANDUM BY DUBOW, J.:                **FILED AUGUST 20, 2018**

In these consolidated appeals,[1] Appellant Superior Moving & Storage Company, Inc. ("Superior"), and Appellant Jana S. Paley ("Paley"), appeal from the Judgment entered against them jointly and severally after a non-jury trial. Following careful review, we reverse the Judgment as against Superior and affirm the Judgment as against Paley.

The trial court's April 28, 2017 Opinion contains a detailed recitation of the relevant facts and procedural history, and, because the parties are well aware of them, we need not restate them at length here. **See** Trial Ct. Op., 4/28/17 at 1-21. Briefly, George Hadley ("Appellee"), initiated this action seeking to recover for Superior's and Paley's respective roles in his loss of a rare Rodin sculpture. Appellee sought to hold three defendants responsible—Superior, Paley, and Joel Moranz. Appellee alleged that: (1) Moranz was responsible because it was from his home that the sculpture went missing; (2) Paley was responsible because she converted the statue from the Moranz home and failed to assist in its recovery; and (3) Superior was responsible because it lost the sculpture after Paley placed it in its storage facility.[2] The

---

[1] We have consolidated these appeals *sua sponte*.

[2] Appellee raised claims of Breach of Contract for Bailment, Negligent Bailment, Negligence, and Breach of Fiduciary Duty against Moranz; Conversion/Trespass to Chattel, Negligence, and Breach of Constructive Trust against Paley; and Negligence and Breach of Contract/Third Party Beneficiary against Superior.

three defendants filed cross-claims, each seeking to hold the others fully responsible for losing the sculpture.[3]

A five-day bench trial commenced on September 28, 2016. On October 21, 2016, the trial court issued its Findings of Fact and Conclusions of Law ("FFCL"), and entered a verdict for Appellee, and against Superior and Paley, jointly and severally, in the amount of $729,920 plus interest. The court also assessed $1,000,000 in punitive damages against Paley. The court assessed an additional $129,849 plus interest against Paley for legal fees and prejudgment interest.[4]

In particular, the court found Paley liable to Appellee for Conversion. FFCL, 10/21/16, at 9. The court further found that when Paley converted the sculpture, she became a constructive trustee with Appellee as the beneficiary. *Id.* at 11. With respect to Superior, the court found Superior liable to Appellee because Appellee is a "constructive beneficiary of the bailment between Superior and Paley." *Id.*

---

[3] On August 3, 2015, Paley filed a Joinder Complaint joining Karina Walton as a defendant, alleging that she played a role in the sculpture's ending up at Christie's in New York City for auction. However, after Walton filed for Chapter 7 bankruptcy protection, the court severed Paley's joinder claims against Walton and permitted the matter to proceed against Moranz, Superior, and Paley. Walton and Appellee were involved in a separate litigation in New York arising from the disposition of the sculpture, which resulted in a settlement and release between Walton and Appellee. Walton is not a party to this appeal.

[4] The court also found that Moranz was not liable to Hadley and entered Judgment in Moranz's favor. Trial Ct. Op., 4/28/17, at 28.

Superior, Paley, and Appellee filed timely Post-Trial Motions. On January 10, 2017, the court heard argument on the Motions. On January 27, 2017, Superior filed a Motion asking for permission to supplement its Post-Trial Motion to incorporate what it claimed was newly discovered evidence. The court denied the Motion on February 1, 2017. On February 6, 2017, the court denied the Post-Trial Motions of all parties.

These appeals followed. Superior, Paley, and the trial court all complied with Pa.R.A.P. 1925.

Superior raises the following nine issues on appeal:

1. Did the trial court commit an error of law when it articulated a theory of liability that was not asserted by [Appellee] and which does not exist under Pennsylvania law?

2. Did the trial court commit an error of law when, after erroneously conferring *de facto* third party beneficiary status upon [Appellee], it refused to follow Pennsylvania law requiring that the third party beneficiary be subject to any limitations found in the contract?

3. Did the trial court commit an error of law when it failed to give force to the federal Carmack Amendment, 49 U.S.C. § 14706, which preempted [Appellee's] claims against Superior?

4. Did the trial court commit multiple errors of law regarding the Pennsylvania Fair Share Act, 42 Pa.C.S. § 7102 ("Fair Share Act" or the "Act"), when it found: (1) the Act did not apply because one co-defendant was found to have committed an intentional tort, (ii) it was not required to apportion liability between Superior and Paley, and (iii) it could deny Superior the Act's mandate of separate and several liability solely because Paley committed an intentional tort?

5. Did the trial court abuse its discretion when it failed to apportion liability to settling defendant Karina Walton ("Walton"), despite overwhelming evidence of her wrongdoing?

- 4 -

6. Did the trial court abuse its discretion when it found that [Moranz] was not liable to [Appellee] in either Moranz'[s] individual capacity or in his capacity as executor of the estate of Elaine Moranz?

7. Did the trial court abuse its discretion when it failed to allocate a percentage of liability to [Appellee] for his contributory negligence?

8. Did the trial court abuse its discretion in determining that the fair market value of the Rodin was $1,459,080[] when that finding was incompetent because it was speculative and not based on facts?

9. Did the trial court commit an error of law when it refused to allow Superior to supplement its Post-Trial Motion to consider newly acquired evidence regarding the arrest of Walton on federal criminal charges related to her involvement in the theft of the Rodin, when the criminal complaint was filed after trial of this matter and Superior attempted to bring it to the court's attention as soon as it became aware of it?

Superior's Brief at 5-7.

Paley raises the following eleven issues on appeal:

1. Whether the trial court committed legal error, made unsupported findings, disregarded binding evidence[,] and capriciously disbelieved testimony by entering a verdict against Paley for conversion where [Appellee's] evidence established Paley moved the statue as requested for safekeeping, had consent to retain the statue, was not requested to return the statue, would have returned the statue if asked[,] and had no intent other than to return the statue when requested?

2. Whether the trial court committed legal error and abused its discretion by imposing $1,000,000[] of punitive damages against Paley where the conversion verdict was unsound, the statue's move was not outrageous or conduct directed to [Appellee], the award was not based on post-incident activity and bad thoughts[,] and no one died or suffered a catastrophic injury?

3. Whether the trial court committed legal error and made unsupported findings by entering a verdict against Paley for violation of constructive trust where Paley did not take title to

- 5 -

the statue, did not have, or take advantage of, a confidential relationship or swindle anyone out of the statue[,] and the findings were contrary to the claim [pleaded] by [Appellee] and the trial court's 1925 [O]pinion?

4. Whether the trial court committed legal error and made unsupported findings by entering a verdict against Paley for negligence where the trial court included no finding of liability for negligence or analysis supporting the negligence claim?

5. Whether the trial court committed legal error by entering a verdict against Paley where the evidence did not establish Paley was the legal cause of [Appellee's] damages and revealed extraordinary conduct by Superior who sold or failed to protect the statue, Walton who stole and then lied about her title to the statute[,] and [Appellee] who consented to the statue's sale that superseded Paley's conduct and caused the complained of result?

6. Whether the trial court committed legal error by not marking [Appellee's] claims satisfied and/or released where [Appellee] released and paid the statue's thief and received the auction proceeds from Christie's?

7. Whether the trial court committed legal error by entering a verdict against Paley where [Appellee] consented to sale even though he could have saved it from auction without undue burden, expense[,] or humiliation?

8. Whether the trial court committed legal error by assessing prejudgment interest where interest is not recoverable for the claims asserted by [Appellee], damages for diminution in value were awarded[,] and the assessment dates were erroneous or absent?

9. Whether the trial court committed legal error by not adjudicating the cross-claims and apportioning liability among the parties and Walton?

10. Whether the trial court committed legal error by not adjudicating Paley's indemnity claim and failing to enter judgment for Paley and against Superior for the full extent of Paley's liability to [Appellee] where a right to indemnity existed?

11. Whether the trial court's treatment of the evidence and record has deprived Paley of a full and fair appellate review where it is

impossible to discern what material the trial court relied on for its verdict and the totality of the circumstances suggests the trial court's credibility determinations were colored by material not in evidence?

Paley's Brief at 2-7.

### **Superior's Appeal**

Superior first claims that it is entitled to judgment notwithstanding the verdict ("JNOV") because the trial court erred in finding that it owed Appellee a duty as a "constructive beneficiary of the bailment contract" between Superior and Paley. Superior's Brief at 25 (citing Trial Ct. Op., 4/28/17, at 24). We agree.

We start by discussing those cases in which a trial court should enter a JNOV. The court shall enter JNOV if it reviews the record and concludes that even with all factual inferences decided adverse to the movant, the movant is entitled to judgment as a matter of law. *Southwestern Pennsylvania Regional Council, Inc. v. Gentile*, 776 A.2d 276, 281 (Pa. Super. 2001). A court will also enter JNOV if it reviews the evidentiary record and concludes that the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. *Id.*

On appeal, when reviewing a trial court's denial of a Motion for JNOV, we must consider whether there was sufficient competent evidence to sustain the verdict, viewing the evidence and all reasonable inferences in the light most favorable to the verdict winner. *Buckley v. Exodus Transit & Storage Corp.*, 744 A.2d 298, 304-05 (Pa. Super. 1999).

"Questions of credibility and conflicts in the evidence are for the trial court to resolve and the reviewing court should not reweigh the evidence. Absent an abuse of discretion, the trial court's determination will not be disturbed." *Holt v. Navarro*, 932 A.2d 915, 919 (Pa. Super. 2007). Our scope of review over questions of law, however, is plenary. *Buckley*, 744 A.2d at 305.

In this case, Superior argues that it is entitled to JNOV because the trial court erred in finding that Superior owed Appellee a duty because Appellee was a "constructive beneficiary of the bailment contract between Superior and Paley." Superior's Brief at 25 (citing Trial Ct. Op., 4/28/17, at 24). Superior avers that this theory does not exist under Pennsylvania law, Appellee did not plead it, and that the trial court erroneously misapplied and conflated the third-party beneficiary and constructive trust doctrines to confer *de facto* third-party beneficiary status on Appellee. *Id.* at 25-26, 28.

Superior further argues that even considering the theories of constructive trust and third-party beneficiary separately, those theories do not impose on Superior a duty to Appellee. *Id.* at 23, 26, 28-29.

We next turn to the trial court's analysis. The trial court found that Superior owed a duty to Appellee because Appellee was a "constructive beneficiary of the bailment contract between Superior and Paley." Trial Ct. Op. at 24. The trial court reasoned that, "Superior's duty [to Appellee] . . . arose from the bailment relationship." *Id.* at 22. The trial court then identified two bailment relationships. First, the trial court found that when

Appellee lent the sculpture to Moranz, the parties created a bailment relationship. The trial court also identified a bailment relationship between Paley and Superior, created when Paley hired Superior to move her personal items and she "delivered" the sculpture to Superior for storage. The trial court connected these two separate and distinct bailment relationships to find that Appellee was the "constructive beneficiary of the bailment contract between [Superior] and Jana Paley." Trial Ct. Op. at 24.

As an initial matter, there is no legal support for a theory of a "constructive beneficiary of the bailment contract." There is, likewise, no legal basis to connect two separate and distinct bailment relationships.

Additionally, the trial court appears to be conflating two legal theories: constructive trusts and third party beneficiaries. Those theories, however, even considered individually, do not impose on Superior a duty to Appellee.

A constructive trust is a legal fiction that arises "**when a person holding title to property** is subject to an equitable duty to convey it to another on the ground he would be unjustly enriched if he were permitted to retain it." *DeMarchis v. D'Amico*, 637 A.2d 1029, 1036 (Pa. Super. 1994) (citation omitted) (emphasis added). In this case, the trial court found, and we affirm, that Paley had committed the tort of Conversion when she took the sculpture from the Moranz home.[5] FFCL at 9. *See also* Trial Ct. Op. at 23. However, since Paley converted the sculpture, she could not hold title to it.

---

[5] Paley challenges this conclusion in her first issue on appeal. We address the merits of Paley's claim *infra*.

*L.B. Foster Co. v. Charles Caracciolo Steel & Metal Yard, Inc.*, 777 A.2d 1090, 1095 (Pa. Super. 2001). Since Paley did not, and could not, hold title to the sculpture as its converter, the trial court had no legal basis to impose a constructive trust in Appellee's favor.

Additionally, Superior never held legal title to the sculpture and, thus, there is no legal basis to impose a constructive trust on Superior for the sculpture in favor of Appellee.

Since there is no legal basis to impose a constructive trust on either Paley or Superior in favor of Appellee, Appellee could not be a "constructive beneficiary of the bailment contract" as the trial court concluded.

The theory of third-party beneficiary similarly does not impose upon Superior a duty to Appellee. Courts will confer third-party beneficiary status upon a person who is not a party to a contract if the contract between the parties contained an express intention to benefit that third party. *Kirschner v. K&L Gates LLP*, 46 A.3d 737, 762 (Pa. Super. 2012). Additionally, if the evidence establishes that **both parties** to the contract intended a third party to benefit from the contract at the time they formed it, she may be entitled to assert third-party beneficiary status despite the parties not having specifically named her in the contract. *Burks v. Federal Ins. Co.*, 883 A.2d 1086, 1088 (Pa. Super. 2005).

It is undisputed that neither the language of the service contract between Superior and Paley nor the evidence of the parties' intent demonstrates that Superior and Paley intended that Appellee was a third-party

beneficiary to their moving contract. In fact, there is no evidence that Superior had any knowledge that Paley was not the rightful owner of the sculpture. Thus, the theory of a third-party beneficiary, to the extent that the trial court relied upon it, does not impose a duty on Superior to Appellee.

Finally, we disagree with the trial court's application of the theory of common law conversion to Superior's role in this case. The trial court relies upon the principle that "the receiver of converted property is also a converter." Trial Ct. Op. at 24. This principle applies to a purchaser, not a receiver, of converted property. **Underhill Coal Min. Co. v. Hixon**, 652 A.2d 343, 345-46 (Pa. Super. 1994) (explaining that "a good faith purchaser of the goods from a converter is also a converter and must answer in damages to the true owner" and reiterating that "a *bona fide* purchaser from a thief gets nothing"). Since Superior did not purchase the sculpture from the Appellant, but rather was a bailee of the sculpture, the principle of common law conversion does not apply to Superior.

Therefore, we find as a matter of law that the trial court erred in finding that Superior owed a duty to Appellee and consequently, in entering Judgment

against Superior and in favor of Appellee.[6]  Accordingly, we reverse the Judgment in Appellee's favor against Superior.[7]

**Paley's Appeal**

**Issue 1**

In her first issue, Paley claims that the trial court erred in denying her Motion for JNOV because Paley is not liable to Appellee for Conversion of the sculpture.

To reiterate, the trial court shall enter JNOV if, after reviewing the record, it concludes that even with all factual inferences decided adverse to the movant, the movant is entitled to judgment as a matter of law or if it concludes that the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. *Gentile*, 776 A.2d at 281.

Paley argues that she is not liable for Conversion because: (1) she moved the sculpture to fulfill Elaine Moranz's request; (2) Joel Moranz did not demand that she return the sculpture, and, in fact, agreed that Paley could keep it until Appellee resurfaced; (3) she would have returned the sculpture

---

[6] We note the trial court's outrage with the manner in which Superior handled the sculpture and Paley's other personal items and the trial court's determination that Superior performed those services negligently.  It is more appropriate, however, for the trial court to address that issue when deciding Paley's cross-claim against Superior.

[7] In light of this disposition, we need not reach Superior's remaining issues on appeal.

- 12 -

if Moranz had asked; and (4) she had no intent other than to return the sculpture to Appellee. Paley's Brief at 64-75.

We have thoroughly reviewed the certified record, the parties' Briefs, the applicable law, and the well-reasoned trial court Opinion, and conclude the trial court did not err as a matter of law in concluding that Paley converted Appellee's sculpture. The trial court ably disposes of this issue and we affirm on the basis of that Opinion. *See* Trial Ct. Op. at 25-26 (concluding that: (1) Paley did not receive permission to remove the sculpture from the Moranz home; (2) the trial court did not believe Paley's self-serving testimony that Elaine Moranz told Paley before Moranz's death to take possession of the sculpture and return it to Appellee; (3) the evidence indicated that Paley intended to keep the sculpture for herself; and (4) the existence of a demand to return the sculpture is not an element of Conversion and, in any case, there was no evidence to support Paley's claim that she would have returned it if asked).

**Issue 2**

In her second issue, Paley claims the trial court abused its discretion by imposing punitive damages of $1,000,000 against her.

The imposition of punitive damages is appropriate where the conduct at issue is "outrageous" and is "done with a bad motive or with a reckless indifferen[ce] to the interests of others." *Sears, Roebuck & Co. v. 69th Street Retail Mall, L.P.*, 126 A.3d 959, 983 (Pa. Super. 2015) (citation omitted). The purpose of punitive damages is to punish a tortfeasor and to

- 13 -

deter future tortious conduct. *J.J. DeLuca Co., Inc. v. Toll Naval Associates*, 56 A.3d 402, 416 (Pa. Super. 2012) (citation omitted).

This Court will only reverse an award of punitive damages if it is so excessive that it shocks the Court's sense of justice. *Shared Communications Services of 1800-80 JFK Blvd. Inc. v. Bell Atlantic Properties Inc.*, 692 A.2d 570, 576 (Pa. Super. 1997). "The determination of whether a person's actions arise to outrageous conduct lies within the sound discretion" of the trial court, and this Court will not reverse a punitive damages award absent an abuse of that discretion. *J.J. DeLuca*, 56 A.3d at 416 (citation omitted).

In awarding punitive damages, the court should focus on "the act itself together with all the circumstances including the motive of the wrongdoer and the relations between the parties[.]" *Chambers v. Montgomery*, 192 A.2d 355, 358 (Pa. 1963). "[A] request for punitive damages does not constitute a cause of action in and of itself. Rather [it] is merely incidental to a cause of action." *Grimm v. Grimm*, 149 A.3d 77, 90 (Pa. Super. 2016).

Bootstrapping onto her first issue, Paley initially avers that the assessment of punitive damages was improper because the verdict based on conversion was invalid. Paley's Brief at 76. In light of our disposition of Paley's first issue, we do not agree.

In the alternative, Paley presents three other arguments in support of her claim of error. First, she argues that her conduct in moving the sculpture was not outrageous, and, thus, does not support the award of punitive

damages. *Id.* Next, Paley avers that the award of punitive damages was improper because the court based them on Paley's conduct after the sculpture had been stolen from Superior. *Id.* at 79. Stated another way, Paley claims that the court erred because "the outrageous conduct used to impose punitive damages must be the same conduct as formed the basis for liability[,]" *i.e.*, the conversion. *Id.* Last, Paley argues that the award is improperly excessive and shocks the conscience because "no one died or suffered catastrophic personal or emotional injury." *Id.* at 80.

We have thoroughly reviewed the certified record, the parties' Briefs, the applicable law, and the well-reasoned trial court Opinion, and conclude the trial court did not abuse its discretion by awarding Appellee punitive damages. The trial court ably disposes of this issue and we affirm on the basis of that Opinion. *See* Trial Ct. Op. at 32-33 (highlighting the evidence in the record that supported the award of punitive damages and explaining that the award was not excessive in light of Paley's reckless indifference to Appellee's rights and her lack of contrition, as well as the relative amount of compensatory damages awarded and Paley's personal wealth).

**Issue 3**

In her third issue, Paley claims the trial court erred in denying her Motion for JNOV because Appellee failed to establish that she breached a constructive trust. In support, she emphasizes that she did not obtain title to the sculpture, the court did not find that she and Appellee had a confidential relationship,

and she did not derive an economic benefit from the sculpture. Paley's Brief at 81-84. We agree.

As explained *supra*, a constructive trust only arises when a person who holds legal title to property is subject to an equitable duty to convey it to another. *DeMarchis v. D'Amico*, 637 A.2d at 1036. Here, as a converter of Appellee's property, Paley did not hold title to it. *L.B. Foster*, 777 A.2d at 1095. Because Paley did not hold title to Appellee's property, the court erred in finding that Paley's possession of the sculpture created a constructive trust of which Appellee was the beneficiary. Accordingly, the court erred in entering a verdict in favor of Appellee on his Breach of Constructive Trust claim.[8]

**Issue 4**

In her fourth issue, Paley claims that the trial court erred in failing to make a finding on Appellee's alternative claim of Negligence. Paley's Brief at 87. Paley avers that the trial court's failure to address this claim results in a *de facto* finding that she was not liable to Appellee in Negligence. *Id.* She suggests, therefore, that the trial court's findings and verdict should be "modified" to note that the court found in her favor as to Appellee's Negligence claim. *Id.* Paley has not developed this argument with citation to any case law to support this assertion and it is, thus, waived for appellate review.

It is well-settled that failure to argue and to cite any authority supporting an argument constitutes a waiver of the issue on appeal. *Jones*

---

[8] However, because the trial court entered verdict against Paley on other claims, this does not change the verdict or Judgment.

*v. Jones*, 878 A.2d 86, 90 (Pa. Super. 2005); *see* Pa.R.A.P. 2101. This Court will not act as counsel and will not develop arguments on behalf of an appellant. ***Bombar v. West American Ins. Co.***, 932 A.2d 78, 93 (Pa. Super. 2007). Paley's failure to develop this issue with citation to authority has substantially hindered our ability to conduct meaningful appellate review of this issue. Accordingly, this issue is waived. ***See*** Pa.R.A.P. 2101. ***See also Bombar***, *supra* at 95; ***Jones***, *supra* at 90.

**Issue 5**

In her fifth issue, Paley challenges the denial of her Motion JNOV on the grounds that Appellee produced insufficient evidence that her conduct proximately caused his damages. Paley's Brief at 88. Paley argues that the conduct of Superior, Walton, and Appellee were "supervening" causes of Appellee's damages. ***Id.***

Specifically, Paley avers that she could not have reasonably foreseen that contracting with Superior to move the sculpture would result in its theft or that Walton would place it for auction. ***Id.*** at 92. She also asserts that her conduct was not the legal cause of the diminution in the sculpture's market value, her conduct did not cause Appellee to incur expenses defending himself against the suit brought by Walton, and nothing she did caused Christie's delayed payment to Appellee after it auctioned the sculpture. ***Id.*** at 93-95.

We have thoroughly reviewed the certified record, the parties' Briefs, the applicable law, and the well-reasoned trial court Opinion, and conclude the trial court did not err denying Paley's Motion JNOV and in finding that Appellee

presented sufficient competent evidence to support the trial court's finding that Paley's conduct proximately caused Appellee's damages. The trial court ably disposes of this issue and we affirm on the basis of that Opinion. **See** FF at ¶¶ 19-22, 30-38, 47, 50, 57-58.; Trial Ct. Op. at 25-26-(discussing the credible evidence presented by Appellee that showed that Paley's actions in converting the sculpture proximately led to it being stolen).

**Issue 6**

In her next issue, Paley avers that the trial court erred in rejecting her claim that the "doctrine of satisfaction and release" applied to the instant case and operated to satisfy or release Appellee's claims against her. Paley's Brief at 96, 98, 101. Paley asserts that Appellee's "claims against Paley were released by operation of law when [Appellee] released Walton[,]" because "the release of the primarily liable party extinguishes any claims against the secondarily liable party." **Id.** at 97, *quoting* **Shaw v. Thomas Jefferson University**, 80 A.3d 540, 545 (Pa. Cmwlth. 2013) (citation omitted).[9] We disagree.[10]

---

[9] **Shaw** is distinguishable from the instant action. In **Shaw**, a pedestrian filed an action against Thomas Jefferson University and the City of Philadelphia, alleging that she was injured as a result of a fall on a university sidewalk. The City filed a cross-claim against the university for contribution and indemnity. There, the trial court granted the motion for summary judgment filed by the City—the secondarily liable party—after the university-the primarily liable party—had received judgment in its favor.

[10] Paley's Brief also sets forth three variations on this theory of relief, which we also find meritless. **See** Paley's Brief at 98, 100.

Paley's argument that Walton was the primary tortfeasor is specious at best, and is belied by the evidence and the court's findings. In an effort to foist responsibility for Appellee's loss entirely onto Walton, Paley completely omits from her Brief any mention of the fact that the trial court found that she was responsible for the initial conversion of Appellee's property. It was Paley's tortious conduct in converting the sculpture in the first instance that triggered her liability, and not, as she argues, Walton's subsequent conduct.

Moreover, and contrary to Paley's claim, the Pennsylvania Uniform Contribution Among Tort-feasors Act ("UCATA") provides, in relevant part, that "[a] release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors **unless the release so provides**[.]"[11] 42 Pa.C.S. § 8326 (emphasis added). ***See also Baker v. AC&S***, 729 A.2d 1140, 1147 (Pa. Super. 1999) (same). Paley does not allege that the release between Appellee and Walton contained any provisions releasing Paley from liability. Absent evidence that Appellee explicitly released his claims against Paley when he released Walton from liability, Paley's argument fails.

Paley's last argument is based on a misstatement of fact, *i.e.*, that Appellee had been fully satisfied by the release of the escrowed funds from Christie's as part of the settlement with Walton. Actually, the trial court found

---

[11] To the extent that Paley argues that the UCATA does not apply because this is "not an action for injury to . . . property," we disagree. ***See***, ***e.g.***, 18 Pa.C.S. § 1106(h) (defining injury to property as "[l]oss of real or personal property . . . or decrease in its value[.]"

that, on the date of its removal from the Moranz home, the sculpture had a fair market value of $1,459,080, but that the escrowed funds released from Christie's to Appellee totaled only $729,160.08. The court further found that Appellee had incurred $129,851.40 in expenses to obtain the escrowed funds and to mitigate his losses. Thus, the credited evidence demonstrated that, contrary to Paley's contention, Appellee's settlement with Walton releasing the escrowed funds did not fully satisfy his claims. Accordingly, Paley is not entitled to relief on any of the alternative grounds she advances here.

**Issue 7**

In this issue, Paley asserts that the trial court erred in entering the verdict against her because Appellee had a duty to mitigate his damages but failed to do so. Paley's Brief at 102. Further, Paley claims that, in order to mitigate his damages: (1) Appellee had an obligation to pursue Christie's return of his sculpture to him; (2) "[b]y consenting to the sale, [Appellee] waived his claim for the return of the statue or to recover an amount higher than the auction price[;]" (3) Appellee could have prevented the sculpture's auction price from being deficient had he enjoined the sale of the sculpture or disputed its title; and (4) the trial court erred in finding that Appellee's settlement with Walton served to mitigate his damages because he was at risk of being sued by Walton because "[t]here was no legitimate basis for a claim against [Appellee] by Walton." *Id.* at 102-03.

Paley proposes no fewer than five ways that she believes Appellee could have mitigated his damages, and cites cases standing for the general

propositions that a plaintiff has a duty to mitigate damages and cannot recover for damages that he could have prevented. *Id.* at 102-05. However, Paley has utterly failed to develop her argument with citation to relevant case law that would explain how the trial court's findings and ultimate conclusion were erroneous. Because Paley has failed to develop this issue, she waived it. *See id*. *See also Bombar*, *supra* at 95; *Jones*, *supra* at 90.

**Issue 8**

In her eighth issue, Paley claims the trial court erred in awarding Appellee prejudgment interest because "prejudgment interest is not recoverable in tort actions." Paley's Brief at 105. Thus, she concludes there is "no legal basis for recovery of prejudgment interest." *Id.* at 106. Paley also argues that the award of prejudgment interest was erroneous because the trial court did not make a finding that Appellee had demanded the return of the sculpture, and that the date from which the court assessed prejudgment interest was "demonstrably erroneous." *Id.* at 106-07. Paley asserts a similar argument with respect to the assessment of interest on the attorney's fees and costs paid by Appellee. *Id.*

The premise underlying this issue is Paley's assertion that "prejudgment interest is not recoverable in tort actions." Paley does not, however, support this proposition of law with citation to any authority. Similarly, with respect to her argument concerning the trial court's erroneous "assessment dates," Paley has again failed to cite any authority supporting her claim that the trial court used incorrect dates when calculating the prejudgment interest owed to

Appellee. This issue is, therefore, waived.[12] **See** Pa.R.A.P. 2101. **See also**

**Bombar**, **supra** at 95; **Jones**, **supra** at 90.

**Issue 9**

In her ninth issue, Paley alleges that the trial court committed legal error

by not adjudicating the cross-claims and apportioning liability among her

Superior, and Walton. Paley's Brief at 107.

Given our disposition of Superior's appeal in which we found that the

trial court erred as a matter of law in entering a Judgment against Superior

and in favor of Hadley, we find this issue moot as to Superior. Paley does not

set forth any argument in her Brief as to why the court erred in not

apportioning liability to Walton. We find, therefore, that Paley has abandoned

this claim as to Walton.

**Issue 10**

In her penultimate issue, Paley claims that the court erred in not ruling

on her cross-claim against Superior for indemnification. **Id.** at 108-10. She

avers that she is entitled to indemnity from Superior because Superior

breached its contract with her by failing to secure the sculpture. **Id.**

---

[12] Moreover, we note that, while generally prejudgment interest is not recoverable in tort cases where the damages sought are unliquidated, in tort actions a plaintiff may recover prejudgment interest in the form of delay damages. **See Robert Wooler Co. v. Fidelity Bank**, 479 A.2d 1027, 1034 (Pa. Super. 1984) (explaining that, "[t]o the extent that prejudgment interest is recoverable in tort cases, it is more accurately identified as compensation for delay). **See also** Pa.R.C.P. No. 238 ("Damages for Delay in Actions for [] Property Damages.").

In light of our finding that the trial court erred in entering Judgment against Superior and in favor of Hadley, we agree. We, therefore, remand this case for the trial court to hold a hearing, if necessary, and make findings of fact regarding Paley's cross-claim for contribution and indemnity from Superior.

**Issue 11**

In her last issue, Paley concludes that she "cannot receive a fair review on appeal" because the trial court grossly mishandled the record. *Id.* at 110-11. She avers that Appellee's "counsel did not properly move [Appellee's] exhibits into evidence" and the court "admitted as evidence exhibits never referenced during trial." *Id.* at 115-16. Paley argues that it "is impossible to figure out what the trial court actually reviewed and relied on as the source of its verdict and opinion." *Id.* at 118. She concludes that she "cannot obtain a fair appellate review on the basis that the trial court's many credibility determinations were an abuse of discretion absent an accurate accounting of what the trial court considered." *Id.* Paley asserts, therefore, that she is entitled to either Judgment entered in her favor, or a new trial. *Id.*

The trial court filed a supplemental Opinion addressing this claim of error. Following our thorough review of the record, the trial court's supplemental Opinion, and the parties' Briefs, we conclude that this issue lacks merit. The trial court ably disposes of this issue with citation to the record and we affirm on the basis of that Opinion. *See* Trial Ct. Op, 10/3/17, at 1-10 (explaining that: (1) Paley did not object to the admission into evidence of

- 23 -

Appellee's exhibits at the conclusion of trial; (2) Paley did not raise any objection to the court's reliance on disputed exhibits in her Post-Trial Motion; (3) Paley did not raise any claim of error regarding the exhibits received by the court in her 1925(b) Statement; and (4) once the court discovered that the parties' exhibit binders were missing, it endeavored to assemble the record and assure its completeness and accuracy for appellate review).

Judgment as against Superior reversed. Judgment as against Paley affirmed. Case remanded for further proceedings consistent with this memorandum, including disposition of Paley's cross-claim against Superior. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/20/18

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| GEORGE M. HADLEY | : | |
| Plaintiff | : | DECEMBER TERM, 2014 |
| | : | |
| v. | : | |
| | : | |
| JOEL MORANZ, INDIVIDUALLY | : | |
| AND AS EXECUTOR OF THE ESTATE | : | No. 1620 |
| OF ELAINE MORANZ , DECEASED | : | |
| | : | |
| JANA S. PALEY | : | 840 EDA 2017 |
| | : | |
| | : | 842 EDA 2017 |
| SUPERIOR MOVING & STORAGE | : | |
| COMPANY, INC. | : | |
| Defendants | : | |

# OPINION

This Opinion arises from the appeals filed by Defendant-Appellant Superior Moving & Storage Company, Inc. ("Superior") and Defendant-Dppellant Jana S. Paley ("Paley") from the judgment entered against them in the above-captioned matter. Plaintiff-Appellee George M. Hadley ("Hadley") brought suit against Superior, Paley and a third defendant, Joel Moranz, individually and as executor of the estate of Elaine Moranz ("Moranz"), seeking recovery for the defendants' respective roles in losing a valuable piece of art. At the conclusion of a non-jury trial, a finding was entered in favor of Hadley and against Superior and Paley, and in favor of Moranz and against Hadley. The Court found against Superior and Paley, jointly and severally, in the amount of $729,920.00, plus interest. Paley was additionally assessed $129,849.00 plus interest, individually, for Plaintiff's legal fees in connection with the New York litigation and

prejudgment interest. The Court also assessed $1,000,000.00 in punitive damages against Paley. Superior and Paley both filed post-trial motions, which the Court denied. The Court additionally denied a motion by Superior only to be allowed to amend it post-trial motion, well after the filing deadline, on the basis that it had discovered new evidence. Judgment was entered on the findings.

Superior and Paley now appeal. As the issues raised by the two co-defendants are inextricably intertwined, the Court will address the issues raised on appeal in a single opinion. In their respective 1925(b) statements, Paley and Superior challenge virtually all of the court's findings of fact and conclusions of law. This is in keeping with the prior efforts of these parties, whose post-trial motions contained 82 and 481 paragraphs, respectively. Provided that the Superior Court does not find the number of issues raised to be "outrageous" and therefore the issues raised on appeal waived, *see Donoughe v. Lincoln Elec. Co.*, 936 A.2d 52, 59 (Pa. Super. 2007), **overruled on other grounds,** *see Nelson v. Airco Welders Supply*, 107 A.3d 146 (Pa. Super. 2014), the Court will address the gravamen of each party's complaint. The Court will recount the procedural history of the case and the voluminous testimony received at trial before addressing the issues raised on appeal.

## Procedural History

This case began by Writ of Summons on December 10, 2014. Hadley thereafter filed his complaint on March 4, 2015. As explained more fully below, Hadley sought to hold three defendants responsible for the loss of a rare sculpture and the consequences of the loss: (1) Joel Moranz, from whose home the sculpture was unlawfully taken, (2) Jana S. Paley, who converted the piece from the Moranz home and failed to assist in its recovery, and (3) Superior Moving &

2

Storage Company, Inc., who lost the sculpture after it was placed in its storage facility by Paley. The three defendants filed cross-claims, each seeking to hold the others fully responsible for the loss. On August 3, 2015, Paley filed a joinder complaint against Karina Walton, who is suspected of having stolen the sculpture or having received it after it was stolen. On or about September 28, 2015, Walton filed for Chapter 7 bankruptcy.[1] On October 2, 2015, Paley filed a Suggestion of Bankruptcy, advising the Court of Walton's bankruptcy and requesting that this matter be placed in deferred status. On October 7, 2015, Hadley filed a Motion to Sever the claim against Karina Walton, pointing out that the matter could not proceed against a debtor subject to the automatic stay provisions of Section 362 of the Bankruptcy Code. 11 U.S.C. § 362(a). On November 2, 2015, this motion was granted by the Honorable Linda Carpenter, and Paley's joinder claim against Walton was severed, permitting Hadley to proceed against Moranz, Superior, and Paley as defendants.

Trial was held for five days beginning on September 28, 2016. The matter was held under advisement until October 21, 2016, when the Court issued its Findings of Fact and Conclusions of Law. The Court found in favor Hadley and against Superior and Paley, jointly and severally, in the amount of $729,920.000 plus interest. The Court also assessed punitive damages against Paley in the amount of $1,000,000.00. Paley was additionally assessed $129,849.00 plus interest, individually, for legal fees and prejudgment interest. The Court found in favor of defendant Joel Moranz and against Hadley.

Superior, Paley, and Plaintiff Hadley timely filed post-trial motions. Oral argument on the motions was held on January 10, 2017. On January 27, 2017, Superior filed a motion asking to be allowed to supplement its post-trial motions to incorporate what it claimed was newly discovered evidence. On February 1, 2017, this motion was denied. On February 6, 2017, the

---

[1] *See* Case No. 15-28173, U.S. Bankruptcy Court for the District of New Jersey.

3

Court denied the post-trial motions of all parties. On March 2, 2017, Superior and Paley filed the instant appeals to the Superior Court. On March 3, 2017, the Court issued an order pursuant to Pa.R.Civ.P. 1925(b)(1), ordering the appellants to file a Statement of Errors Complained of on Appeal. Superior timely filed its statement on March 22, 2017. Paley timely filed her statement on March 24, 2017.

## Evidence Presented at Trial

This case revolves around the disappearance and ultimate fate of a valuable piece of art – a rare bronze casting of Auguste Rodin's *Le Basier* ("The Kiss"). It was originally owned by George Hadley, who inherited it from his mother, and she from Hadley's grandfather, the president of the American Tobacco Company. Through the unusual sequence of events described below it came to be in possession, lawfully or unlawfully, of defendants Joel Moranz, Jana S. Paley, Superior Moving & Storage Company, Inc., the severed defendant Karina Walton, and ultimately an unknown purchaser living in Hong Kong. Appellants Superior and Paley assert that the Court's findings as to its liability were against the weight of the evidence and represented a misapplication of the law. Each of the appellants also argue that all or some of their liability should be apportioned to their co-defendants or to the severed defendant Karina Walton.

Below is the evidence presented at trial. The Court's Findings of Fact and Conclusions of Law, issued on October 21, 2016, are also attached to this opinion as an Appendix.

Plaintiff George Hadley testified he is an airline pilot who currently resides in Boston. His grandfather, George Washington Hill, was the president of the American Tobacco Company. His grandfather had in his private collection two statues by the artist Auguste Rodin – "The

4

Kiss" and "Eternal Springtime." The statues were left by Hadley's grandmother to his mother and were left to him when she died. When Hadley's work as an airline pilot took him away from home more frequently, he decided that it was unsafe to keep the statues in his home. He decided to entrust one of the statues, "The Kiss", to his friend and attorney Elaine Moranz. Hadley testified that the two were quite close. He also felt that her home in Wallingford, PA, would be a secure place for the statue. It was understood he was only loaning the statue to Elaine, and he could retrieve it whenever he wanted. He knew of Appellant Jana Paley, who was living as a house guest with the Moranzes at the time, but never intended to loan the statue to her.

In 1998 Hadley moved to Rhode Island. That same year Elaine Moranz and her husband Joel moved to Newtown Square, PA, and they took the statue to their new home with Hadley's permission. In 2010 Elaine told Hadley she had ovarian cancer. However, she was upbeat and believed it was treatable. At one point Hadley asked Elaine to return the sculpture to him, but when she told him it gave her comfort, he agreed to allow her to keep it longer. Beginning in 2010 Hadley suffered from numerous personal difficulties, including long working hours, tax problems with the Canadian government, and a property dispute in Rhode Island. He also spent much time in New York caring for his ailing father. He stopped communicating with many friends, including Elaine. He probably last spoke to Elaine three to four months before her death in October, 2011. He was not aware of her death at the time it occurred.

On October 27, 2013, Hadley felt a "longing" to look at the statue. He searched for images of "The Kiss" on Google and found a statue that looked very much like his own was on auction at Christie's on November 5. The piece to be auctioned included unusual features such as the words "Paris" and "France" printed on the sculpture. Hadley wondered right away if this sculpture was his own. He then searched for Elaine Moranz on Google and, for the first time,

5

found out she had died. The next day he called Joel Moranz and was told Elaine had passed and the statue had gone missing after being taken from Moranz's home by Paley.

Hadley received Paley's email address from Moranz. Paley could not be reached by telephone because she did not answer it and her voicemail inbox was full. Hadley was warned Paley could be skittish if she felt she were threatened. Therefore when Hadley began an email conversation with Paley he did not immediately address the issue of the statue. In the emails that followed, Hadley thought it was odd Paley claimed to have been unable to find him after Elaine's death. Hadley eventually mentioned the Christie's auction to Paley, and his "paranoia" that his sculpture might be the one for sale. Paley's responses ignored the issue of the statue, but she eventually admitted to taking it. Hadley began sending increasingly desperate emails, asking to meet with Paley to discuss the statue. Paley agreed to meet him and then broke off the meeting more than once. In the meantime, Hadley called Christie's, whose representative asked for proof of loss, such as an insurance claim or police report. Hadley tried to get this information from Paley. Around the 29th Hadley hired an attorney, John Sutherland. Hadley and Sutherland contemplated a lawsuit against Christie's, but decided against it. Eventually Hadley agreed to sign an agreement with the seller, Karina Walton, and Christie's to escrow the proceeds of the sale, which went forward. Hadley felt he had no choice. Paley continued to ignore his emailed requests for information.

The Court was shown a videotaped deposition of defendant Jana Paley, who testified as follows: She testified that she is a licensed attorney but has never practiced law. She considers herself a "sophisticated businessperson." She met Elaine Moranz in 1991, and in 1993 moved in with Elaine and her husband Joel because she was suffering from an illness. Paley did not pay rent, but says she had a written lease with the Moranzes starting in 1994-1995 and became a

6

"tenant." Except for some stays in her own apartment and winters spent in Sun Valley and visits to Sarasota, Paley lived with the Moranzes until December, 2012. She was aware of the Rodin statue, which was prominently displayed in both of the Moranz homes, and admired its beauty.

Paley testified she met George Hadley shortly after meeting the Moranzes. She was aware that Hadley was a client of Fox Rothschild and Elaine Moranz. She was also "aware of" but did not personally know a man named David Rasner of Fox Rothschild. Rasner had performed legal services for Hadley in the past.

Paley testified she had had conversations with Elaine Moranz before her death, where Elaine allegedly told her she wanted the statue returned to Hadley and Paley agreed to "take care of it." Nonetheless Paley admitted she knew the statue belonged to Hadley and Joel Moranz was the executor of Elaine's estate.

After Elaine Moranz's death, Paley says she tried to find Hadley. She testified that she searched Hadley's name on Google but could not find anything. Paley said she did have Elaine's Blackberry and address book but disposed of them about a year after her death. She contacted friends at Fox Rothschild but did not speak with David Rasner. She had spoken to Joel Moranz about Hadley but does not believe Moranz made any effort to find him.

Paley testified she and Joel both agreed she should move back to her own home. Paley said she bore no ill will toward Joel Moranz, but she was upset he was going to be married to another woman soon after Elaine's death. Paley also believed Joel's new wife was a "gold digger" and her family had been involved in illegal activity. Paley based this opinion on statements she heard from friends. Paley's opinion of Moranz's intended, and a desire to deprive the new wife of the statue, was a clearly malicious motivating factor in Paley's conversion of the statue.

7

Paley testified she considers herself an art collector. Nonetheless, the move from the Moranz home was the first time she had ever placed any art in storage. The move took place from October, 2012, to January, 2013, with most of the move occurring during the week of Christmas.

Paley engaged Superior to perform the move, and her main contact was Mark Brenfleck. Paley told Brenfleck the items to be moved were hers and never mentioned the Rodin in advance. Although Superior was supposed to handle the packing, it was a very large job and Paley herself helped along with some of her friends and Joel Moranz's housekeeper. Paley testified that on December 29 she pointed at the Rodin and said something along the lines of "that needs to be moved" or "that needs to be packed." She told Superior to use a crate but they did not have one, so the movers ended up wrapping the sculpture in a blanket. Superior also took other valuable art during the course of the move and Paley says she was never told it was Superior's policy not to take such art.

Paley testified Joel Moranz was present on and off during the move, and admits the situation was "chaotic" and difficult to supervise. At one point Joel did make a remark to Paley about her having taken the sculpture, to which she replied that she "had it moved." Paley says Moranz did not seem surprised or upset.

On August 20 of the same year Paley called Mark Brenfleck and told him it was time to move the items out of storage and to her new home in Philadelphia. On August 21, she sent an email to Superior complaining that a number of her items were missing, including handbags and luggage. She did not ask about the Rodin. At the time she thought first of her own belongings. Paley was told by Superior there were more lockers to deliver. She first realized the Rodin was missing on August 30. At this time she became concerned because a great number of items had

8

not been delivered. She sent an email to Superior, in which she characterized the Rodin as something "a friend had loaned...to me and my business partner, Elaine Moranz, many years ago." Paley claimed she said this to make certain that Superior understood the item was supposed to go with her move.

After the statue went missing, a friend named Wendy Cromwell, an art dealer, told Paley she should register the piece with the Art Loss Registry. Paley did not, although she registered some of her own art. She also wrote a note on the FBI website but never contacted them. During this time she stated in an email to Cromwell she hoped her "pal", meaning George Hadley, never came looking for the sculpture.

Paley testified she was advised by others that finding the sculpture was a lost cause. Cromwell apparently told her such things are "never found." She consulted former Philadelphia District Attorney Lynne Abraham, who told her "for all you know, it could have been melted down by now." Paley testified she was also told if she called the FBI, the movers might retaliate violently against her.

Ultimately, Paley concluded that it would be a "colossal waste of time" to look for the statue. She reasoned that eight months later, there was no way it could be recovered. Friends told her: "Jana, don't cry over spilled milk. Just move on." Despite requests from Superior to fill out a claim form on the Rodin, she never did.

On October 28, 2013, Paley received her first email from Hadley inquiring about the statue. A number of emails followed over the next few days. Initially her responses to Hadley ignored his inquiries about the statue. When she did admit the sculpture was gone, she claimed taking it from Joel "came out of great thought and discussion." She tells Hadley they should agree the statue was on lifetime loan to her and Elaine, even though she knew this was not true,

9

in order to preserve a possible insurance claim. She later decided this was a bad idea because it would sound like a scam.

Paley was not responsive to several emails, allowing hours to go by without response. On several occasions she told Hadley she would meet with him, but ultimately never did. She advised him to tell Christie's what happened, and said the FBI Art Theft Unit was aware of the theft. She stated she would call a man named Barret White, a client of hers, at Christie's. She stated that while she had spoken to Lynne Abraham, she "had not engaged her yet." Hadley eventually told Paley that he was negotiating with Christie's about it, and that he was being threatened with a lawsuit by the consigners if he stopped the sale.

Paley claims she was not speaking with Superior anymore at this point, but on November 22, Paley sent an email to Tim Collins of Superior inquiring about a desk she owned that had been damaged. After being shown this email, Paley testified that it refreshed her memory that she was still in contact with Superior and may still have had a claim. She did not tell Hadley about this.

Hadley sent Paley an email on November 17 saying that he was meeting with the Art Theft Division and asked her if she had any material from Superior he could show them. Paley testified she was not sure if she responded to this email.

On January 3, 2014, Hadley emailed Paley informing her the sale went forward and he was being sued. He asked for her help. Paley testified she did not believe it was likely the statue sold at Christie's was Hadley's and felt she could not be of help. She testified she had a "lot of things going on in her life."

In addition to the deposition testimony read into the record, Jana Paley testified live in Court. Her testimony was as follows: That she is a real estate developer and was a member of

10

the house of Joel and Elaine Moranz, who she described as very close friends, for almost 20 years, at both Wallingford and Newtown Square. Elaine Moranz was also her attorney and a business associate.

Paley testified Elaine had told her to take care of the statue in the event anything ever happened to her and to return it to Hadley when he asked for it back. Paley claimed she tried hard to look for Hadley after the death of Elaine. She said both Joel and Elaine believed Hadley lived in Rhode Island and not Boston and this made her search more difficult. She said she spoke with Elaine's secretary, who did not know where Hadley was. She tried writing to the fishing camp Hadley owned, whose address she got off a bottle of maple syrup made at the camp that she found in the Moranz home, but this effort proved fruitless.

Paley testified she chose Superior to move her things, and the Rodin, out of the Moranz home because they were "excellent" and she had used them before, as had many of her tenants. On the day of the move, Paley was assisted by friends and a housekeeper. The movers from Superior did in fact take some china and silver belonging to Joel Moranz along with Paley's items, but Paley said this was not at her direction. Paley argued there was too much going on for her to "supervise" the entire move. Ultimately, not only the Rodin but also property belonging to Paley, such as artwork and designer clothing, went missing.

Paley explained she did not pursue a claim against Superior's insurer because "I have a very busy life" and the claim would be complicated, perhaps not justifying the legal bill it would entail.

Paley says she had no proof of the provenance of the statue and she understood Hadley to have only a photo of the statue in his grandfather's home.

11

On September 27, 2013, almost a month before Hadley made contact with Paley, she sent an email to the FBI in Philadelphia concerning the missing statue. Paley admitted she represented herself as the owner of the statue in the email, but justified it on the grounds that the true story was too convoluted to be believed by the FBI.

Paley also testified to the content of emails from Wendy Cromwell, an art adviser in New York that Paley knew and who was aware of the situation surrounding the statue – that it was loaned to Elaine, and that neither Paley nor Joel Moranz knew where Hadley was. Ms. Cromwell advised Paley to file a claim for lost works with the "Art Lost Register HTTP."

In another email to Hadley, Paley indicated she had talked to Lynne Abraham about representing her, but had not engaged her yet. She also told Hadley "Before our lawyers talk you and I need to have the reasons straight, that the piece was on loan to me and in my control." Paley stated she thought Hadley should agree to this in order to make it easier to prove the chain of custody to Christie's.

Paley says she did not file an insurance claim because she thought it would be difficult to prove. She said she was not "aware of any writings between Hadley and Elaine that prohibited [her] from taking the statue out of the home." Joel also never expressly forbade her from doing so. She stated her intention was to return the statue to Hadley if he ever returned for it. Lastly, Paley identified a receipt showing she did engage Lynne Abraham with regard to the contact with the FBI.

Joel Moranz's testimony was entered into the record via a deposition which was read in court. He testified as follow: Joel Moranz said the bronze known as "The Kiss" was "entrusted to [his] wife" around 1995-1996. His wife Elaine, who was with the firm of Fox, Rothschild, O'Brien & Frankel, had represented Hadley in a real estate matter. Hadley had entrusted it to her

12

for an "indefinite" period of time until he was ready to take it back. Moranz testified there was no "implication" of ownership on Elaine's part. The sculpture was kept in both of the Moranz homes – first in Wallingford and later in Newtown Square. A pedestal was made for the purpose of displaying it. Moranz had only seen Hadley once socially, and that was at his 50th birthday party in 1996.

Moranz testified the statue was removed from his home in either December or January of 2013. He understood that Superior took it, but he never actually saw them remove it from his home. He found out it was gone when his housekeeper told him. He testified Paley did not have the authority to remove the statue from his home. Several of Moranz's own possessions, such as china, were missing as well. Some of the china would also end up lost after being sent to Superior. Moranz testified he is not sure if he spoke with Paley directly or contacted her by email or text about the missing items, because they were not speaking much at the time. But he was told that the taking of the china was an accident and that Paley planned to contact Hadley and return the sculpture to him. If she could not, she planned to loan it to Smith College. Moranz understood that Hadley's mother had gone there and it might have been on loan there before.

Moranz testified he did not contact Hadley after his wife's death. Hadley was living in Boston and had contacted Elaine before her death to say he was ready to take the statue back. Moranz cannot say whether he ever contacted her again. Moranz's only effort to find Hadley was to search for Hadley's name on Google. He did this several months after Elaine's passing because he knew he would be moving soon and wanted to return the statue. Moranz testified Hadley then contacted him "several months" after Elaine's death to ask for the return of the

13

statue - and this was probably the first time Hadley heard of Elaine's death. At this time Moranz told Hadley that Paley had the statue and that she had said she would return it.

Moranz explained Paley had originally moved into his home because she had significant health issues and could not live alone. The reason for his strained relationship with Paley at the time of the removal of the statue was her resentment of his fiancée. Moranz testified Paley had contacted members of his family and friends to say disparaging things about his fiancée.

After the removal of the statue, Moranz did not make any insurance claim on it. He testified he believed Paley meant to return it to Hadley. He also did not make an insurance claim on his missing china because he was relying on Paley to pursue it with Superior. He did, however, make a police report for the stolen china. Paley did not contact Superior, who he had also used when moving out of his home, about the missing items because the items had been stored under Paley's direction.

Moranz testified Paley is "sometimes" truthful. He speculated that she may have psychological issues related to her chronic pain, and is "heavily medicated."

Moranz testified he and Paley had spoken about the statue and returning it to Hadley sometime after Elaine's death.

Mark Brenfleck, the president and owner of Appellant Superior Moving & Storage Company, Inc., testified as follows: that he founded the company over 35 years ago and has served in his current role since then. The company deals in household and office moving and storage. Superior both moves customers' items into storage and provides self-storage. At the time of Paley's move the company had 17 trucks, roughly 70 employees and did 75-100 jobs per week. Superior had an 119,000 square foot warehouse with nearly 2,000 storage units.

14

Brenfleck's described his biggest responsibility with the company being to dispatch the men, but he also works on payroll and employee relations.

At the time of Paley's move, Superior had a fruitful relationship with Paley. She had used Superior many times and would recommend them to others, leading to new clients for Superior.

Brenfleck testified as to the standard procedure at Superior that would have been in effect at the time Paley moved out of the Moranz home. When speaking with a customer in preparation for a move, Brenfleck questions them on the items to be moved, to get a sense of the size of the job. He might also send out a "surveyor" to help ascertain this fact. With Paley's move, she declined to have a surveyor come because she had moved with Superior so many times.

During a typical move the driver of the truck also acts as "supervisor" of the goods. Items are inventoried when they are taken from the home, first by being labeled and then entered onto an inventory sheet. The condition of the property at the time of move is noted. However, for Paley's move, many items were already boxed. Inventorying the goods is the supervisor's job.

Once items are taken to the warehouse, the warehousemen check the items taken against the inventory. If more than one truck comes in at once, the warehousemen will "scan" multiple trucks at once to make sure the goods are being unloaded properly. They are also supposed to make sure they are not "bringing items into the warehouse that we don't accept because our insurance wouldn't be able to handle them." Brenfleck is not involved in the unloading of items at the warehouse.

Brenfleck testified Superior has a computer system that is used to keep track of whose property is in each vault. Customers provide the locks, and are encouraged to keep the keys,

15

although Superior will keep them if the customer is afraid of losing them. These keys are marked and kept in a safe. Brenfleck also testified as to the facility's security system. He stated that they have a "thorough camera system" as well as alarms, and that the building itself has thick walls and is surrounded by a barbed wire fence.

When a customer is ready to pick up their goods, items are crossed off the inventory or else "scanned" while under the supervision of the warehouse manager. They are specifically looking out for any broken items so that they can be repaired first.

In the event that Superior has to foreclose on a locker, the items contained therein are sold to various buyers. Brenfleck testified that this happens up to 500 times per year, and in 25 years in business Superior has accidentally sold the vault of a paying customer on two occasions. One of the buyers who bought from foreclosed vaults in the 2012-2013 period was Jim Davis, who Brenfleck referred to as a "flea market guy."

Brenfleck further testified Superior had a policy in place to not accept artwork, antiques, or "anything expensive." Brenfleck testified there are movers who specialize in such things, but that Superior does not. Brenfleck said Superior does not advertise itself as such a mover.

Brenfleck testified to the events surrounding the move of the sculpture in October, 2012. Brenfleck spoke with Paley about the move in advance and he gave her a list of things Superior cannot move. Brenfleck also said that he knew her well as a customer and knew she typically had valuable items, and asked her to buy additional insurance, but she did not. Brenfleck says Paley requested specific people to handle the move – Mel Figueroa, Eleotorio Leon and Eric Leon.

Brenfleck said at the time of the move Paley did not mention anything about a Rodin statue, George Hadley, or that any of the property to be moved did not belong to her. Brenfleck

discussed the Bills of Lading used for this move – one for each of the several days Superior spent at the Moranz home. The Bills provide the option for the customer to purchase more insurance, and the customer is asked to list any items of exceptional value. Brenfleck next testified about the inventory sheet filled out by one of his movers the day of Jana Paley's move. Next to each item should be a notation describing the item's condition and whether it was packed by the owner or by Superior. The form in question contains a listing that says "rodin" (sic) but has no notation accompanying it.

In August, 2013, Superior transported Paley's goods from its warehouse to Paley's new home in Philadelphia. Brenfleck first became aware that some of Paley's items were apparently missing when Tim Collins, the Superior employee who was in charge of claims of loss, told him about it. Brenfleck said he normally does not get involved with issues of loss but he did in this case because of the scale of the loss. Once Brenfleck became involved, he investigated the vaults himself to see if any items were left behind. He says he did not get a chance to speak with the movers himself, but one of his subordinates did. Brenfleck says Superior did not contact the police because there are often false alarms when customers think an item was not delivered when the customer in fact misplaced it.

Despite a reputation for being good movers, Brenfleck testified he later fired the three men who were involved in Paley's move. However, Brenfleck claimed this firing was for misconduct unrelated to the loss of the Rodin. Tim Collins has since passed away.

Brenfleck testified at one point the FBI did come to him as part of their investigation into the theft. At this time Brenfleck says he picked a woman out of a photo array he was shown – Karina Walton. He did not know her name at the time but he knew he had seen her before, and that she was the girlfriend of Jim Davis, the "flea market guy" who did business with Superior.

17

Finally, Brenfleck said he personally had no way of knowing whether the Rodin ever got onto one of Superior's moving trucks or whether it ever made it to his warehouse.

Two experts testified as to the value of the statue. Plaintiff's expert, Jerome Le Blay, was qualified as an expert in Rodin sculpture. He attended the University of Paris and had a pre-PhD in art sociology. After graduating in 1992 he joined the Rodin Museum in Paris. He later worked at Christie's as a specialist. He is currently working on a complete catalogue of the work of Rodin while also working as an art adviser and art dealer. He considers himself, along with one or two others, to be the foremost expert on Rodin valuation in the world. The Court qualified him as an expert.

Le Blay was familiar with the statue in question, having examined it at Christie's request in September of 2013. At the time all he knew of its provenance was that it supposedly belonged to a woman named Walton, who he had not heard of. He testified to the sculpture's unique and interesting features. Among other things it was cast at the Barbedienne foundry and was printed with the words "Paris" and "France", which was highly unusual. In preparation for the trial Le Blay formed an opinion as to the value of the sculpture and prepared a report. He considered sales of similar works, in size and quality. He also considered the evidence of provenance, and came to the conclusion that if the true provenance of the statue had been known, it would have increased in value in the eyes of buyers. He noted the statue had been in the collection of George Washington Hill, it had been in the same collection for almost 70 years, and that it had been exhibited in institutions like the prestigious Vassar Collection.

Le Blay concluded with the additional information about the provenance, the value of the work on November 5, 2013, would have been between 20 and 30 percent higher. Le Blay was also asked to evaluate the value of the statue if it had been sold at the end of 2012. In May of

18

2012 similar works of 25 and 72 centimeters high, sold for $900,000.00 and $2.4 million respectively. Hadley's statue was 60 centimeters high. Le Blay concluded that the market was "strong" at the end of 2012 and the statue would have sold for more at that time than it ultimately did in 2013.

Le Blay also testified the sculpture could have sold for even more if it had been sold along with Hadley's other Rodin – "Eternal Springtime." Remarking on the importance of provenance, Le Blay stated "There is a lot of storytelling about the provenance and the circumstances out of the works, where they were kept or where they were acquired. And I think for Mr. Hadley the story would have been perfect for the art market at the time." He concluded the statue was worth $1,459,080.00 in December, 2012 (the month the statue was removed from Hadley's home). Le Blay also testified it was not uncommon to see green felt pads on the bottoms of statues, which Hadley's sculpture had. He also opined that auction houses like Christie's "take great care" of their customers, and suggested that Christie's would have been likely to defer to someone willing to pay a million dollars for a Rodin statue vis-a-vi someone like George Hadley.

The three defendants jointly employed an expert, Emily Thompson, who was to opine on the value of Hadley Moranz's Rodin sculpture and counter the opinions of Mr. Le Blay. Thompson has two bachelor degrees, in art history and English, and a master's degree in art administration from NYU. Her work experience included jobs with a specialist auction house in Manhattan and a "boutique appraisal firm" that specializes in appraising art for damage, loss, and litigation support. As part of her work she conducts fair market value analyses. Thompson also worked as an appraiser at an international firm. She is a member of the Appraisers Association of America. She was qualified as an expert by the Court.

19

In connection with this litigation, Ms. Thompson prepared an expert report on the value of the Rodin statue on November 6, 2013. The report purported to determine the "fair market value review appraisal", with fair market value being defined as "the sale of a work between a willing buyer and a willing seller, neither being under any obligation to buy or sell and both with reasonable knowledge of the facts." The report was prepared according to the standards of the "Uniform Standard Of Professional Appraisal Practice." This is determined primarily by looking at previous, comparable sales of similar works that are sold at public auction. Her report also looked at the general art market during the relevant time period. In terms of the Rodin at issue, Ms. Thompson looked at the catalogue information which was available from Christie's, Mr. Le Blay's report, and some of the documents from the present suit.

Ms. Thompson reviewed the prices of the roughly 200 pieces of "The Kiss" that sold in the relevant time period, which came in different sizes. Ms. Thompson considered both the "hammer price" – that is, the literal sale price at the end of the auction, and the "buyer's premium", which is an additional 15-20 percent that is paid to the auction house. Together they make up the fair market value.

Ms. Thompson focused on sales of "The Kiss" which were of a similar size to Hadley's piece. The two she felt were most "comparable" were sold for $850,000 and approximately $1,000,000. She concluded that the sale price that Hadley's Rodin received, $965,000, was "well within previous sales for similar pieces."

Ms. Thompson testified that she disagreed with several of the bases of Mr. Le Blay's valuation. First, she thought it was "speculative" to say the sculpture would have sold for more in 2012 than when it actually sold in 2013. Second, she disagreed as to the significance of the provenance in this case. While provenance matters, Ms. Thompson testified that it is usually

20

significant when the previous owner was a major collector, and according to her research Mr. Hill was not known as an art collector. Third, Ms. Thompson also felt it was "speculative" to say that selling "The Kiss" as a pair along with the "Eternal Springtime" would have increased the price.

The Court considered the testimony of Plaintiff's expert, and not Defendants', to be compelling and incorporated it in its findings of fact.

## Discussion

Superior and Paley's 1925(b) statements are voluminous, and challenge almost all of the Court's significant, or not, legal and evidentiary rulings. However, the issues raised therein can be divided into several broad categories. The Court will therefore address the major issues of law and fact in this fashion.

### Superior Violated a Duty Owed to Hadley

Superior alleges that it owed no duty to Hadley whatsoever, in tort or in contract, as a matter of law. Thus, it asserts that it has no liability to him for the loss of the statue, and therefore could not be liable for the theft of the statue resulting from its negligence.

From the outset, it should be noted that Superior does not challenge the Court's finding that it was negligent in its handling of the statue, including its failure to adequately search of it when it went missing. (Court's Findings of Facts and Conclusions of Law pgs. 11, 18-26). The crux of Superior's argument is that it had no responsibility whatsoever to the legal owner of the property stored in its warehouse, and its negligent handling thereof is irrelevant. Rather, its only responsibility was to the converter, Paley. This position is untenable.

21

Superior's duty, as well as the duties of its co-defendants, arose from the bailment relationship. A bailment is the "delivery of personalty for the accomplishment of some purpose upon a contract, express or implied, that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it, otherwise dealt with it according to his directions or kept until he reclaims it." *Price v. Brown*, 680 A.2d 1149, 1151-52 (1996) (*quoting Smalich v. Westfall*, 269 A.2d 476, 480 (Pa. 1970). A cause of action for a breach of bailment requires that the plaintiff establish that personalty has been delivered to the bailee, a demand for return of the bailed goods has been made, and the bailee has failed to return the personalty. *Brown*, 680 A.2d at 1152. When the plaintiff produces evidence to satisfy those elements, the defendant has the duty of going forward with evidence accounting for the loss. If the defendant fails to do so, he is responsible for the loss. *Id.* (*citing Schell v. Miller North Broad Storage Company*, 16 A.2d 680 (Pa. 1940)).

The law distinguishes three main types of bailments, namely: (1) those for the sole benefit of the bailor (the party delivering the goods), (2) those for the sole benefit of the bailee (the party holding the goods), and (3) those for the mutual benefit of both bailor and bailee. *Beechwoods Flying Service Inc. v. Al Hamilton Contracting Corp.*, 464 A.2d 440, 443 (Pa. Super. 1983). The standard of care required of a bailee depends on the kind of bailment involved; in the case of a bailment for mutual benefit, the bailee is require to exercise "ordinary diligence" with regard to the bailed property and is responsible for "ordinary neglect." *Ferrick Excavating and Grading Co. v. Senger Trucking Co.*, 484 A.2d 744, 748 (Pa. 1984) (*citing First National Bank of Carlisle v. Graham*, 79 Pa. 106, 116-117 (1875). Ordinary diligence is defined as "[T]hat care which men of ordinary prudence customarily take of their own goods of a similar kind and under similar circumstances." *Beechwoods*, 464 A.2d at 443.

22

When George Hadley loaned the Rodin to Elaine Moranz, a bailment was created. This bailment was one for mutual benefit, as the testimony showed that Hadley benefited from knowing that his property was safe in a secure home and that the Moranzes benefited from being able to display an exquisite work of art. When Elaine Moranz died, Joel Moranz both individually and as her successor became responsible as bailee for the property. Joel Moranz was subject therefore to the duty of "ordinary care" imposed on him as bailee in a mutual benefit bailment. The Court found that, without his knowledge and through no negligence of his own, Moranz's long term houseguest Jana Paley removed the statue from his home. It was undisputed that Paley was not party to this bailment contract. Paley's actions in removing the statue without the permission of Hadley or Moranz, and arranging for them to be taken to be stored amongst her possessions, constituted conversion.[2]

Paley contracted with Superior to remove the Rodin and place it in storage. When Superior agreed to move and store the sculpture at the behest of Paley, another bailment was created. The delivery of the property by Paley to Superior created a "bailment for hire", another form of a bailment for mutual benefit. A bailee for hire is not an insurer of the goods it holds, but can be held liable for the loss of bailed property if it is "guilty of some negligent act or omission which is the proximate cause of their loss." *Beechwoods*, 464 A.2d at 443. A bailee may be liable for the theft of the bailed property if there is some fault on its part. *Moss v. Bailey Sales & Service, Inc.*, 123 A.2d 425, 550-551 (Pa. 1956).

The Court found the theft of the property from Superior's custody was "the result of Superior's own negligence" (Court's Findings of Fact and Conclusions of Law pg.18), and this finding is supported by the record. Despite the fact that Superior's president Mark Brenfleck claims the company had a firm policy against moving valuable art or "anything expensive",

---

[2] Paley's arguments as to the law of conversion will be addressed below.

23

Superior knowingly endeavored to take the Rodin. Paley was well known to Superior, and they could not have been unaware she would be moving valuable items. Indeed the Rodin was not the only valuable item taken by Superior the day of Paley's move, as Superior also removed other valuable paintings owned by Paley as well as expensive designer clothes. Superior's own invoice reflects that a "rodin" (sic) was packaged and moved. But no apparent care was taken to ensure the sculpture would be properly handled and protected from theft.

Furthermore, Superior subsequently fired the employees who were involved in Paley's move, lost the records of the move, and the supervisor died. This raises the inference that more details of Superior's handing of the objects have been suppressed.

After Superior became aware the property had disappeared, Superior was further negligent in failing to make serious efforts to recover the property.

The Court found Superior's actions in mishandling the property bailed to it rendered it liable to the owner of the property, George Hadley, as constructive beneficiary of the bailment contract between itself and Jana Paley. Superior claims it cannot be liable to Hadley because it did business only with Paley, not him. In essence, Superior argues the fact that the bailor, Paley, was a converter and not the true owner of the property bailed lets Superior off the hook. This theory is spurious. The receiver of converted property is also a converter. In finding that Superior had a duty to the owner, Superior is subject to a burden no more onerous than the one it owes to any client that stores goods in its warehouse. The finding of liability by Superior was appropriate in this case.

Furthermore, it would be inequitable to enforce against Hadley the limitation on liability contained in the standard Bill of Lading entered into between Paley and Superior, which would limit Hadley's recovery on the loss of the sculpture to $0.60 per pound. Hadley was not

24

involved in negotiating the terms of the contract, and his remedies should not be limited because of the decisions of Paley – the converter of his property. This is especially true where these decisions, such as failing to purchase additional insurance, were clearly negligent and the product the converter's clear disregard for the safe handling of the sculpture. It would also be unconscionable to limit Plaintiff's recovery on the value of an irreplaceable masterpiece to a figure calculated on the basis of the sculpture's *weight*. Such a figure would fall so short of compensating Plaintiff for his loss that it would constitute in effect a complete disclaimer of Superior's liability – giving Plaintiff no recovery, and imposing no accountability on Superior.

## Paley Converted the Sculpture and Was Responsible for its Loss

Paley, in her 1925(b) statement, asserts that "there was insufficient evidence introduced at trial and an inadequate legal basis to permit recovery by plaintiff for conversion, negligence and breach of constructive trust." On the contrary, the record was more than sufficient to establish Paley's liability.

Conversion is "the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." *L.B. Foster Co. v. Charles Caracciolo Steel & Metal Yard, Inc.*, 777 A.2d 1090, 1095 (Pa. Super. 2001) (*citing McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 659 n. 3 (Pa. Super.2000). The presence of the sculpture in the Moranz home was the result of the bailment arrangement between George Hadley and Elaine Moranz. The property was not bailed to Paley. After the death of Elaine Moranz, the duty to look after the sculpture fell to her husband Joel Moranz. It is undisputed Paley never received permission from either Hadley or Joel Moranz to remove the statue from the home. Paley did testify that Elaine Moranz had told

25

her shortly before her death that she was to take possession of the statue and return it to George Hadley. But there was no proof that any such conversation took place, except for the testimony of Paley herself, which the Court found to be incredible. Therefore, the Court found Paley had neither consent nor lawful justification to take the sculpture. Furthermore, the Court's found that Paley intended to keep the statue for herself, and this finding was supported by the record. Among the many facts which indicate the intent on Paley's part to take permanent ownership of the item: (1) She personally undertook to have the sculpture appraised several years *before* Elaine Moranz's death, (2) She made only half-hearted attempts, if any, to contact Hadley after Elaine's death, (3) She arranged for the sculpture to be sent to her own home, and (4) She repeatedly represented to others, including Superior, that she owned the sculpture. Paley argues she cannot be liable for conversion because "Moranz did not request [that she] return the sculpture." (Statement of Matters Complained of on Appeal by Defendant, Jana Paley, ¶ 8). The existence of a demand for the return of the property is not an element of conversion. Furthermore, the Court found there was no basis for believing Paley would have complied with such a request if it was made; this would have been inconsistent with her intent to keep the statue. The Court's finding Paley converted the statue was well supported and consistent with the law.

Paley's actions in converting the sculpture, which led proximately to its being stolen and irretrievably lost, are sufficient alone to justify the compensatory damages in this case. But the Court also found her taking of the sculpture without permission resulted in creation of a constructive trust, and Paley violated the duties this relationship imposed on her once she took control of the sculpture. A constructive trust is "a relationship with respect to property subjecting the person by whom the title to the property is held to an equitable duty to convey it to

26

another on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property." ***Kern v. Kern***, 892 A.2d 1, 8 (Pa. Super. 2005) (**citation omitted**). The imposition of a constructive trust is appropriate only where "the defendant has *no right whatsoever* to the property he holds in violation of the plaintiff's rights." *Id.* (**italics in original**). The sole responsibility of a constructive trustee is to return the property to the one on whose behalf the trust is created. ***Buchanan v. Brentwood Federal Sav. and Loan Ass'n***, 320 A.2d 117, 127 (Pa. 1974). It is clear Paley had no right to the property, but nonetheless had taken dominion over it. Therefore the equities of the case justify the imposition of a constructive trust. A trust having been created, Paley had an obligation to return the property to Hadley. Indeed the defense offered by Paley for her conduct in this matter, although the Court did not credit it, was that she in fact took Hadley's property with the intention of keeping it safe until Hadley returned and retrieved it. Paley nonetheless now claims she owed no duty to Hadley to exercise any degree of care over his property. She cannot have it both ways. A trust having been imposed, the Court found Paley failed in her duty to return the sculpture to Hadley, which she was bound to do. Furthermore, the evidence showed her actions and omissions led to the disappearance of the sculpture. Paley made no arrangements with Superior to provide additional care and security for the sculpture. She paid no attention to the sculpture while it was in the care of Superior, just as she did with her own belongings which were similarly in Superior's care. After the sculpture disappeared, she made very few efforts to recover it, failing even to report its disappearance to the police. When the sculpture's whereabouts were actually discovered by Hadley, Paley refused to provide him with even simple assistance which may have resulted in the stoppage of the auction at Christie's. In doing this she fell well short of her duty as constructive trustee.

27

Joel Moranz Was Not Liable for the Loss of the Sculpture

Both Superior and Paley allege the Court's finding in favor of Joel Moranz and against the Plaintiff was inconsistent with the finding of liability on their own parts." (Statement of Matters Complained of on Appeal by Defendant, Jana Paley, ¶ 8, Defendant Superior Moving & Storage Company, Inc.'s Concise Statement of Errors Complained of on Appeal ¶ 6). On the contrary, the evidence presented at trial was fully consistent with this finding and should not be disturbed on appeal. As executor of the estate of his wife, Elaine Moranz, Joel Moranz succeeded to her position as bailee of the sculpture. There was no evidence he was careless in handling the sculpture; rather, it was unlawfully taken from his home by Jana Paley. As stated above, a bailee is not responsible for the theft of bailed property unless there is some fault on his part. *Moss v. Bailey Sales & Service, Inc.*, 123 A.2d 425, 550-551 (Pa. 1956). Paley asserts that Joel Moranz should be held liable for failing to stop her from converting the property, or from failing to get it back from her after she did so. Superior makes the same claim. But the Court found Paley would not have returned the property even if Joel Moranz had insisted on its return. His primary responsibility as bailee after the removal of the property, then, became to account to the bailor for its disappearance, and he discharged this duty. *See Price v. Brown*, 680 A.2d 1149, 1152 (1996) (*citing Schell v. Miller North Broad Storage Company*, 16 A.2d 680 (Pa. 1940)). Unlike Superior and Paley, who were uncooperative or evasive when Hadley returned and attempted to recover his sculpture, Moranz assisted Hadley by giving him information as to the circumstances of its removal. The Court further found even if Moranz were negligent in some fashion, this negligence was superseded by the actions of Paley and Superior. Therefore there was no inconsistency in the verdict and the finding of the Court should be upheld.

28

## Superior and Paley Were Jointly and Severally Liable for the Loss of the Sculpture

The Court found Paley and Superior were jointly and severally liable for the loss in value occasioned by the sale of the sculpture for less than its true value, as found by the Court on the basis of the credible expert testimony. (Court's Findings of Facts and Conclusions of Law pg. 9). This is the approach mandated by the Fair Share Act, which states that a defendant's liability shall be joint and several in an action for an intentional tort. 42 Pa.C.S.A. § 7102(a.1)(3)(ii). The Court found the defendant Jana Paley was liable for conversion, an intentional tort. Therefore joint and several liability was mandated in this case. Both Superior and Paley assert that the provisions of § 7102(a.1)(1) required the apportionment of liability. Section 7102(a.1)(1) provides in pertinent part: "where liability is attributed to more than one defendant, each defendant shall be liable for that proportion of the total dollar amount awarded as damages in the ratio of the amount of that defendant's liability to the amount of liability attributed to all defendants and other persons to whom liability is apportioned under subsection (a.2)." (Statement of Matters Complained of on Appeal by Defendant, Jana Paley, ¶ 27, Defendant Superior Moving & Storage Company, Inc.'s Concise Statement of Errors Complained of on Appeal ¶ 4). This would obviously be inconsistent with § 7102(a.1)(3)(ii). Both appellants also assert that this apportionment scheme should have been applied to allow the Court to find liability on the part of the severed defendant Karina Walton. This would also have been inappropriate, for the reasons explained below.

Karina Walton Was Properly Excluded From the Verdict Slip

The evidence presented at trial showed that Plaintiff's sculpture, having been converted by Paley and having later disappeared while in the care of Superior, somehow ended up in the hands of a flea market proprietor named Karina Walton, the girlfriend of Jim Davis, a man who did business with Superior. Walton presented it to Christie's for auction and misrepresented it as her own. Superior and Paley were negligent in failing to secure and protect the sculpture from the likes of Walton and others who would trade in stolen property. As explained above, Paley filed a joinder complaint against Walton on this basis. But Plaintiff Hadley's motion to sever her as a defendant was granted on November 2, 2015, because Walton had filed for bankruptcy and was therefore subject to an automatic stay. 11 U.S.C. § 362(a). Nonetheless, both Paley and Superior requested at trial that Walton be placed on the verdict slip and be apportioned a percentage of the liability for the loss of the sculpture. This would have been plainly inappropriate for two reasons. First, to do so would have been in violation of the automatic stay. Second, any evidence adduced against Karina Walton was plainly insufficient to apportion *any* liability to her whatsoever. All that was presented to the Court was evidence that Hadley's sculpture somehow ended up in Walton's hands, and that she attempted to sell it at Christie's under false pretenses. No evidence was presented at trial actually accounting for Walton's responsibility, if any, for the theft of the sculpture from Superior. Therefore, it would have been impossible to include her on the verdict sheet.

Furthermore, the fact of Karina Walton's arrest after the trial does not change the situation. After the publication of an article in the Philadelphia Inquirer reporting that Karina Walton had been criminally charged in connection with the theft of the sculpture, Superior filed a motion asking to supplement its post-trial motion, alleging that it now had new evidence which

30

militated in favor of Walton's inclusion on the verdict slip and therefore its argument that a new trial was warranted. The Court denied this motion, because the fact of Walton's arrest did not change the fact that as a bankrupt debtor she simply could not have been subject to liability in this case.

## The Amount of Damages for Loss of Sculpture Are Appropriate

The Court's determination as to the true fair market value of the Rodin on the day of the Christie's auction Walton, i.e. an auction where the sculpture's impressive provenance was not considered, was supported by the thorough and credible testimony of an expert witness, Jerome Le Blay. Mr. Le Blay's credentials as an expert on the art of Auguste Rodin were unrebutted, and he had the benefit of actually having seen the very sculpture at issue in this case. The Court found Mr. Le Blay's testimony far more convincing on this point than the testimony of the defense expert, Emily Thompson. Superior alleges this finding was against the weight of the evidence, and Paley curiously argues that Mr. Le Blay's testimony was inadmissible. The record speaks for itself and the Court's determination as the finder of fact should not be disturbed. (Statement of Matters Complained of on Appeal by Defendant, Jana Paley, ¶ 28, Defendant Superior Moving & Storage Company, Inc.'s Concise Statement of Errors Complained of on Appeal ¶ 8).

Both appellants further argue Hadley failed to properly mitigate his damages by, inter alia, failing to seek an injunction to stop the sale of the statue at Christie's. (Statement of Matters Complained of on Appeal by Defendant, Jana Paley, ¶ 17, Defendant Superior Moving & Storage Company, Inc.'s Concise Statement of Errors Complained of on Appeal ¶ 7). This is another question of fact, best determined by the finder of fact and should not be disturbed on

31

appeal. Suffice it to say the record reflects Hadley's persistent efforts to acquire information from an uncooperative Paley in order to put forward the best case possible to Christie's, and his decision not to seek a TRO was based upon the advice of counsel. The Court could find no issue to challenge the decision. Hadley was not sure the statue was his and his proof of ownership in the New York litigation was at first uncertain.

Paley's breach of duty to Hadley was a significant factor and thus the legal cause of his incurring legal costs to mitigate his losses.


## Paley's Outrageous Conduct Justified the Imposition of Punitive Damages

The imposition of punitive damages is justified where the conduct at issue is "outrageous because of the defendant's evil motives or his reckless indifference to the rights of others.'" *Rizzo v. Haines*, 555 A.2d 58, 69 (Pa. 1989) (**citations omitted**). The Court should focus on "the act itself together with all the circumstances including the motive of the wrongdoer and the relations between the parties. . . .' *Id.* An award of punitive damages should not be disturbed on appeal unless it so excessive that it shocks the Court's sense of justice. *See Shared Communications Services of 1800-80 JFK Blvd. Inc. v. Bell Atlantic Properties Inc.*, 692 A.2d 570, 576 (Pa. Super. 1997) (*citing Lewis v. Pruitt*, 487 A.2d 16, 22 (Pa. Super 1985)). In her 1925(b) statement, Paley asserts that the evidence was insufficient to justify the imposition of punitive damages in this case and that the award is grossly excessive. The decision to impose punitive damages is a matter of the judge's discretion, and the Court's findings concerning Paley's bad motive and reckless indifference to the rights of the Plaintiff are supported by the record. Among other things, the evidence showed Paley coveted the Rodin sculpture even before the death of her friend, the original bailee Elaine Moranz. She undertook to remove it from the

32

home of Elaine's husband, who succeeded her as bailee and where she had been living rent-free for years. There was evidence that she did so in significant part because she was unhappy with Joel Moranz's impending marriage and disliked his new wife. Having taken the sculpture, Paley failed to exercise ordinary care in handling it. Despite claiming that she only intended to keep the sculpture safe until Hadley returned, she repeatedly misrepresented the sculpture as her own. After its loss, she made meager efforts to recover it. She testified that she desired to "move on" and that to worry about its loss would be to "cry over spilled milk." Once Hadley returned and confronted her with the evidence of the impending auction of the sculpture, she had an opportunity to do the right thing and assist Hadley in recovering the property. Despite claiming to have wanted to see the statue returned to Hadley, she did nothing to help him when she had the chance. Indeed, she ignored calls and desperate emails, pleading for her help. Up to and including the day she testified at trial there was no evidence of any contrition on her part.

Jana Paley's attitude toward the property of George Hadley epitomizes reckless indifference to his rights. The imposition of punitive damages was appropriate to punish and deter such conduct. Furthermore, the award of $1,000,000.00 was plainly not excessive, in light of the comparable amount of compensatory damages awarded in this case and the fact of Paley's personal wealth. The Court, in its discretion, admitted deposition testimony wherein Jana Paley states that her personal wealth is in excess of one hundred million dollars. (N.T. 9/30/16 pgs. 30-31).

## Additional Issues

Superior and Paley assert a number of additional issues in their respective 1925(b) statements.

33

Superior asserts that Hadley's claims against it are barred by the "Carmack Amendment", 49 U.S.C. §14706, because it defines the liability of a motor carrier providing transportation services and preempts all state law claims against a carrier for loss or damage to interstate shipments. This argument was not raised until the day of closing argument in the case. Any defense not raised in preliminary objection, answer or reply is waived. Pa.R.Civ.P. 1030(a). Even if properly raised, the statute does not apply: The law applies only to interstate shipments, and the Court found that the destination of the goods was Paley's home in Philadelphia home. (Court's Findings of Fact and Conclusions of Law pg. 3).

Paley claims that Hadley's suit was barred by both the gist of the action and the economic loss doctrine. Both doctrines are irrelevant here. Paley was found liable for the tort of conversion and the Court further found her handling of the property to be negligent in violation of her duty as constructive trustee.

Paley claims the Court failed to adjudicate the cross-claims it filed against Superior asserting its alleged paramount liability for the loss of the sculpture. These claims were disposed of in the Court's verdict.

Both Paley and Superior assert, as a number of separate items of error, that the evidence was either insufficient to support the Court's findings regarding the elements of the cause of actions at issue or these findings were against the weight of the evidence. (Statement of Matters Complained of on Appeal by Defendant, Jana Paley, ¶ 4, ¶ 7, ¶ 9, ¶ 10, ¶ 12, ¶ 13, ¶ 17, ¶ 29). The Court's findings of fact and conclusions of law were supported by the record.

Paley asserts that Hadley's settlement with Karina Walton in the New York litigation represented either a full release or a full satisfaction of all Hadley's claims. However, this release was not presented to the Court as representing a general release.

34

Paley argues that the Court's award of attorney's fees and costs to Hadley was in error. In reality the Court awarded as damages the attorney's fees expended in the New York litigation only, to compensate Plaintiff for having to engage in that litigation, a direct result of Paley's conduct.

Defendants' remaining complaints are without merit. The Court's verdict should not be disturbed.

BY THE COURT:

April 28, 2017

Gene D. Cohen, J.

**APPENDIX: Court's Findings of Fact and Conclusions of Law**

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| GEORGE M. HADLEY | : | |
| *Plaintiff* | : | **DECEMBER TERM, 2014** |
| | : | |
| v. | : | |
| | : | |
| JOEL MORANZ, INDIVIDUALLY | : | |
| AND AS EXECUTOR OF THE ESTATE | : | **No. 1620** |
| OF ELAINE MORANZ | : | |
| | : | |
| JANA S. PALEY | : | |
| | : | |
| SUPERIOR MOVING & STORAGE | : | |
| COMPANY, INC. | : | |
| *Defendants* | : | |

## FINDINGS OF FACT

1.   Plaintiff George M. Hadley ("Hadley") is an individual currently residing in Massachusetts.

2.   Defendant Joel Moranz ("Moranz") is an individual currently residing in Delaware.

3.   Defendant Jana S. Paley ("Paley") is an individual currently residing in Philadelphia, Pennsylvania.

4.   Defendant Superior Moving & Storage Company, Inc. ("Superior") is a Pennsylvania corporation with a principal place of business in Philadelphia, Pennsylvania.

5.   In 1985, plaintiff George Hadley inherited two bronze Auguste Rodin sculptures from his mother, who had inherited them from her father, the former president of the American Tobacco Company.

6. One is a century-old bronze casting of Rodin's passionate work known as "The Kiss" (hereinafter the "the Rodin") and is the subject of this lawsuit. In or about 1994 Hadley decided to entrust the piece to his close friend and attorney Elaine Moranz. Hadley's heavy travel schedule as an airline pilot and the long absences from home that this entailed led him to worry that his valuable art object might be stolen.

7. Hadley visited Elaine Moranz and her husband Joel Moranz often and became familiar with Elaine Moranz's very close friend, Jana Paley, who came to stay with the Moranzes and lived for many years in both their Wallingford and Newtown Square, Pennsylvania homes.

8. When the Moranzes moved to Newtown Square, Pennsylvania, Elaine Moranz asked Hadley if she could move the Rodin to the new home, and he agreed.

9. Moranz was aware throughout this time that although Hadley had loaned the Rodin to Elaine, Hadley expected to get it back. He never viewed it as a gift, and never considered either of them to have had an ownership interest in it.

10. The loan of the Rodin provided a mutual benefit for the parties. Hadley had the comfort of knowing that the Rodin was safe and secure in the custody of a trusted friend, and Elaine Moranz received the benefit of displaying a magnificent work of art on a custom-built pedestal in her dining room.

11. In or about 2008 or 2009, Hadley learned that Elaine Moranz had been diagnosed with ovarian cancer.

12. Hadley visited Elaine less frequently, having moved from Philadelphia to Rhode Island and then to Boston, Massachusetts. He nevertheless continued to stay in touch with Elaine, by telephone or by occasional visit, through at least the summer of 2011.

2

13. At some point, Hadley asked that the Rodin be returned to him, but Elaine asked to keep it a while longer as it comforted her, and Hadley agreed.

14. On October 27, 2011, unbeknownst to Hadley, Elaine Moranz died as the result of ovarian cancer.

15. Soon thereafter, defendant Joel Moranz was named executor of her estate.

16. Paley claims she tried to reach Hadley to notify him of Elaine's death, but her testimony on this issue is undocumented and not credible. Paley, a non-practicing member of the bar, knew Hadley was a Delta Airline pilot and also knew he had been a client of Elaine Moranz and of the law firm Fox Rothschild. Further, Paley destroyed all her own e-mail and the Blackberry smart phone belonging to Elaine Moranz.

17. Paley knew that the Rodin was very valuable, having been valued at $675,000 in 2005.

18. Approximately one year after Elaine Moranz's death, Joel Moranz, contemplating remarriage, requested Paley vacate the Newtown Square home where the Rodin was kept and where Paley had resided for many years.

19. Paley made arrangements with Superior to pick up her belongings from the Moranz's Newtown Square house and transport them to storage, for later relocation to her newly-renovated Philadelphia home.

20. During the move, on December 29, 2012, Paley instructed the movers to remove the Rodin, without the permission of Moranz, who was the lawful possessor of the statute.

21. Paley was disturbed by Moranz's plans to remarry after her friend Elaine's death and wanted to deprive the new wife of the Rodin. She had no lawful or otherwise creditable justifiable reason to take possession of the statute and remove it.

3

22. Superior did take the Rodin as Paley directed, as clearly indicated on a Superior inventory form, which identified it as "rodin" [sic]. It was put on the moving truck along with other artworks and valuables including china and silver belonging to Moranz.

23. When the truck arrived at the Superior warehouse that day there was inadequate supervision of the unloading. Superior's protocol was to return all valuables and artworks after inspecting the unloading. On the day in question the unloading was either unsupervised or poorly supervised at best.

24. The Rodin ultimately ended up in the hands of Karina Walton, a flea market operator. Walton was a close associate of Jim Davis, a purchaser of distressed goods, who frequented the Superior storage facility and was well known to Superior. Walton had been on the premises of Superior accompanied by Davis.

25. Superior never investigated the loss of the Rodin or, for that matter, any of the material Paley had given it for safe-keeping which also ended up missing.

26. Moranz learned of Paley's removal of the Rodin from the Moranz home within a day or so of the removal and questioned Paley about it as well as his missing silver and china. Paley promised a return of his goods when she could get around to it.

27. Moranz did not report the taking or demand the Rodin's return. However, there is no evidence that Paley would have complied had he done so.

28. Sometime in June, 2013, Karina Walton brought the Rodin to Christie's auction house, representing that it was her own, and sought to auction it.

29. Christie's had the piece evaluated by Jerome Le Blay, a recognized authority on Rodin sculpture, and Le Blay recognized it as authentic. The only factor limiting its extraordinary value was its lack of "provenance," the historic chain of custody of an art object that allows a

4

collector to trace its origin. Karina Walton simply claimed that the Rodin was kept in a cardboard box in her deceased father's garage, whereas Hadley could trace the Rodin back to his eminent grandfather and his purchase of "the Kiss" along with another Rodin sculpture.

30. In the summer of 2013, Paley arranged for delivery of the objects she believed were stored at the Superior warehouse.

31. When only some of the objects were delivered, Paley made it clear to Superior that her treasured designer shoes, pocketbooks and graphics were missing.

32. For at least a week, Paley said nothing to anyone at Superior about the Rodin or for that matter her own art which was also missing. Finally, on August 30, 2013, she realized for the first time that it was missing.

33. While complaining about the missing Rodin to Superior, and even talking to an attorney about it, Paley never communicated with local police, never reached out to contact Hadley and never even filled out an insurance claim for the missing Sculpture.

34. Paley waited almost a month to make an attempt to contact the FBI, and then misrepresented the Rodin as her own.

35. Paley spoke disparagingly about plaintiff to Superior, referring to Hadley as a "weird guy."

36. Paley hoped that Hadley would never come looking for the Rodin.

37. Paley's ultimate goal, before the Rodin went missing, was to keep the Rodin for herself.

38. Had Paley not arranged for the Rodin to have been moved out of the Moranz home, it would have remained in Moranz's custody and control.

5

39. Superior showed no concern whatsoever for the missing sculpture, expressing only relief when Paley failed to fill out a claim form. No reasonable investigation was conducted.

40. In the meantime, however, in September 2013, approximately one month after Paley notified Superior that the Rodin was missing, Superior fired all three employees involved in the December 29, 2012, move and lost their personnel files. The employee who was designated to supervise the unloading subsequently died.

41. One evening, while thinking of Elaine Moranz and the Rodin, Hadley went online to look at pictures of "the Kiss."

42. By pure happenstance, Hadley came across a notice of an auction at Christie's auction house in New York, for a cast of "the Kiss" that fit the description of his Sculpture. It had some of the same unusual features that he recognized as unusual characteristics of his own Sculpture - the same height, the same patina, the same carved name of the Barbadienne foundry where it had been cast, the same "K" chasers mark and, most unusual of all, the same carved name of the words "Paris, France," which rarely, if ever, appear on such castings.

43. He searched online for information about Elaine Moranz and, to his horror, saw that she had died more than a year earlier.

44. The following day Hadley called defendant Joel Moranz, who admitted to him that Paley had arranged for Superior to take the Rodin from his home without his permission, and that it had disappeared.

45. Christie's auction house left Hadley with the clear impression that it was unwilling to stop the imminent sale, and unwilling even to escrow the proceeds absent consent of Walton, unless plaintiff agreed to release Christie's. Plaintiff – unaware at that time of the connection between Superior and Davis and Walton – reasonably feared that he may not be able to establish

6

that the Rodin was his, and that a failed TRO attempt would remove all leverage to negotiate an escrow of the proceeds.

46.    While Christie's had guidelines which indicated that it would defer a sale if there was a well-substantiated claim, Christie's own counsel indicated that those were merely guidelines, which vary on a case-by-case basis. Moreover, Hadley understood Christie's position to be that they considered his claim to be unsubstantiated and frivolous. He could show them no police report as they had requested, no insurance claim as they had requested, and no chain of custody/provenance after the point that it left the Moranz household which would tie his sculpture to Walton's.

47.    Paley made no reasonable effort to cooperate with Hadley in supporting a potential injunction action which may have stopped the sale which in fact took place. To the contrary, after a few initial emails trying to justify her behavior, Paley stopped responding to any communications by plaintiff and his attorneys. She had even suggested Hadley change the facts so she would have been the lawful possessor of the Rodin.

48.    Paley feigned interest in putting Hadley in touch with her attorney and with her Christie's contact, Barrett White, but never followed through with any introduction.

49.    Paley's conduct, and her reasons therefore, in causing the removal of the Rodin without plaintiff's consent or even the consent of Elaine Moranz's executor; and in failing to take reasonable steps to retrieve it both before; and after learning it had disappeared; and in failing to assist Hadley once he reached out to her, was outrageous.

50.    Such conduct by Paley demonstrated a reckless indifference to the rights of plaintiff Hadley.

51. Hadley feared that even if he were successful in stopping the sale, the Rodin would be returned at least temporarily to Walton.

52. In an effort to mitigate his losses (which ultimately reduced the damages available in this lawsuit), Hadley entered into an agreement with Christie's that permitted them to escrow the proceeds of the sale.

53. The day after the Christie's sale, Walton filed suit against him in order to capture the Christie's escrow for herself.

54. After approximately 16 months of litigation in the New York litigation it became clear Walton could not sustain her claim. Hadley settled with Walton, in an agreement to pay her counsel fee only.

55. At all times Hadley, after learning of the missing Rodin acted reasonably.

56. Damages suffered by plaintiff Hadley are as follows:

    a. The fair market value of the Rodin on December 29, 2012, the date of its removal from the Moranz home, was $1,459,080.

    b. For purposes of assessing damages, the foregoing fair market value calculation may be reduced by the dollar amount that plaintiff Hadley received from Christie's on or about March 13, 2015: $729,160.08.

    c. Plaintiff Hadley's damages were increased, however, by the need to expend counsel fees and costs in order to obtain the funds addressed above. Those counsel fees and costs, in the amount of $110,142.90 attributable to attorney John Sutherland, $18,523.75 attributable to attorney Dayton Haigney and $1,184.75 attributable to costs paid directly by plaintiff Hadley, were reasonable and appropriate expenses

8

in an attempt to mitigate his losses. Had plaintiff not retained these attorneys and expended these funds, his compensable losses would have been correspondingly higher.

57. The damage of loss of market value was proximately caused by the acts and omissions of the defendants Paley and Superior, jointly and severally.

58. But for those acts and omissions, Hadley would not have lost his Sculpture and would not have suffered the damages enumerated above.

## CONCLUSIONS OF LAW

1. Defendants Paley and Superior are jointly and severally liable for the loss of market value of plaintiff Hadley's Rodin.

2. Defendant Paley is liable to Hadley for his damages in attempting to mitigate his losses due to her lack of cooperation.

### As to Moranz

3. Elaine Moranz's agreement, as bailee, to accept the loan of the Rodin entrusted to her and to return it when George Hadley so requested was an enforceable contract and bailment under Pennsylvania law.

4. When in October 2011 Elaine Moranz died, defendant Joel Moranz owed a duty, as the executor of her estate, as constructive bailee of ordinary and reasonable care.

5. A bailee is only responsible for the loss of the bailed property due to theft or other casualty if the loss was the result of the bailee's own negligence. The Rodin was taken from the Moranz home by Paley without the permission of Moranz.

9

6. Any negligence on the part of Moranz was superseded by the intervening conversion of the Rodin by Paley.

7. Moranz is not liable for damages to plaintiff Hadley for the loss of the Rodin.

## As to Paley

8. Paley exercised dominion over the Rodin belonging to plaintiff Hadley without his consent and without any lawful justification.

9. Paley is liable to Hadley for conversion.

10. Having converted the Rodin, Paley's liability is unaffected by the Fair Share Act, 42 Pa.C.S.A. § 7102, and she is subject to joint and several liability.

11. Furthermore, having taken the property, Paley became a constructive trustee with Hadley as the constructive beneficiary.

12. Paley breached her duty by negligently failing to properly secure the Rodin.

13. Paley breached her duty by placing the valuable item in the care of Superior without insisting on additional care and security of the Rodin.

14. Paley breached her fiduciary duty to plaintiff Hadley by failing to assist him in his efforts to ascertain the whereabouts and ownership of the Rodin. and by failing to promptly notify the police, FBI, or Hadley of the loss of the Rodin at the outset.

15. In general, Paley breached her duty by failing to return the Rodin to the beneficiary of the constructive trust, plaintiff Hadley.

16. Paley's conduct was intentional and outrageous,

17. Paley is liable to Hadley for his damages and also for punitive damages.

10

## As to Superior

18. Superior was a bailee for hire, subject to a duty of ordinary care with respect to the bailed property

19. The second theft of the property was the result of the Superior's own negligence

20. As bailee for hire, Superior owed a duty of ordinary care with regard to the handling of the property, and were liable for theft of the property if the theft resulted from Superior's own negligence.

21. Superior was negligent in its handling and storage of the Rodin, which lead to it being stolen.

22. Superior was negligent, upon receiving notice of the theft, in not endeavoring adequately to recover the stolen property.

23. Superior was liable to the true owner of the property, plaintiff Hadley as the constructive beneficiary of the bailment between Superior and Paley.

24. Superior had a duty to return the property to Hadley.

25. Superior was negligent in its handling of the property, leading to it being stolen.

26. A limitations clause in the moving contract is invalid under the facts of this case.

## DAMAGES

1. Plaintiff Hadley is entitled to recover from both the defendants Paley and Superior the fair market value of the Rodin as of December 29, 2012, less the amounts that he received from Christie's on or about March 13, 2015.

11

2. In addition, plaintiff Hadley is entitled to recover from Paley the legal fees and costs expended in the New York Litigation, which were expended directly by plaintiff as a direct result of the breach of her fiduciary duty as a constructive trustee.

3. In addition, plaintiff Hadley is entitled to recover from the defendant Paley the pre-judgment interest (at a statutory rate of 6%) accrued on the amount received from Christie's, reflecting the delay in receipt of those funds from the December 29, 2012, date of loss through the March 13, 2015, date of receipt.

4. Given Paley's outrageous conduct, and her reckless indifference to Hadley's rights, makes her liable to Hadley for $1,00,000.00 in punitive damages for her conduct and as a deterrent from further misconduct.

## FINDINGS

The Court finds in favor of Plaintiff George M. Hadley against Defendants Jana S. Paley and Superior Moving & Storage Company, Inc., jointly and severally in the amount of $729,920.00 plus interest from December 29, 2013, to March 1, 2015. Further, the Court finds in favor of Plaintiff George Hadley against Defendant Jana Paley in the amount of $129,849.00 plus interest for his cost in mitigating his damage.

Further, the Court awards punitive damages in favor of Plaintiff George Hadley against Defendant Jana Paley in the amount of $1,000,000.00. Further the Court finds in favor of Defendant Moranz against Plaintiff.

BY THE COURT:

October 20, 2016

_____
Hon. Gene D. Cohen, J.

12

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| **GEORGE M. HADLEY** | : | |
| *Plaintiff* | : | **DECEMBER TERM, 2014** |
| | : | |
| **v.** | : | |
| | : | Hadley Vs Moranz Etal-OPFLD |
| **JOEL MORANZ, INDIVIDUALLY** | : | |
| **AND AS EXECUTOR OF THE ESTATE** | : | **No. 1620** |
| **OF ELAINE MORANZ , DECEASED** | : | |
| | : | |
| **JANA S. PALEY** | : | **840 EDA 2017** |
| | : | |
| | : | **842 EDA 2017** |
| **SUPERIOR MOVING & STORAGE** | : | |
| **COMPANY, INC.** | : | |
| *Defendants* | : | |



14120162000231

DOCKETED
COMPLEX LIT CENTER

OCT 3 2017

J. STEWART

---

## OPINION PURSUANT TO THE ORDER OF THE SUPERIOR COURT TO CERTIFY AND TRANSMIT THE CERTIFIED RECORD

This opinion is issued pursuant to the Superior Court's order dated August 3, 2017, directing this Court to certify the original record in this matter in light of the issues raised in Defendant Jana Paley's Application for Remand. Upon reviewing the record, the Court has concluded that a supplemental record must be forwarded to the prothonotary of the Superior Court to complete the record in this case. *See* Pa.R.A.P. 1926(b)(1) ("If anything material to a party is omitted from the record by error... that court shall direct that a supplemental record be certified and transmitted as necessary...") Defendant Paley's application also contains numerous additional claims that the record in this case has been adulterated by, among other things, the inclusion of exhibits that were not in evidence (hereinafter "disputed exhibits"). As

explained below, the Court finds most of these complaints are completely without merit and the remainder are of de minimis value.

In the instant matter, exhibits were accepted into evidence in accordance with a protocol established by the Court. On September 28, 2016, the first day of trial, the Court announced to the parties the procedures to be followed relating to the handling of exhibits. Plaintiff Hadley and Defendant Paley had prepared several binders containing pre-marked documents intended to be offered as exhibits. Several copies of these binders were produced for use by the undersigned judge as well as witnesses and opposing counsel. All of the exhibits, including those identified by witnesses in the course of their testimony, were either copies of original documents or print-outs of electronic documents such as emails. These copies were reviewed by the Court without objection that they were copies. No party disputed their authenticity or their completeness. The exhibits collected and transmitted to the Superior Court are exactly the same material.

Before the first exhibit was shown to a witness, the Court explained the protocol for the handling of exhibits during the course of the trial:

> **THE COURT**: Okay. I think the better process is you direct me to where the exhibit is in the binder. Counsel will look there and see if there is any objection and if there is none, I'll look at it too while he is discussing it. (N.T. 9/28/16 pg. 61).

No objection was raised to this protocol and the protocol was followed. Throughout the trial the Court examined all exhibits as they were identified unless opposing counsel raised an objection. There was no need for the Court to solicit objections to each document as it was produced because it was understood that they would be entertained if raised. *See e.g.* N.T. 9/30/16 pgs. 31-34.

At the conclusion of Plaintiff's case, the following colloquy took place between the Court and counsel for Plaintiff Marc J. Zucker, Esq.:

2

**MR. ZUCKER:** With that, Your Honor, we would like to move a series of exhibits into evidence.

**THE COURT**: Very well. Refresh my recollection, was there anything that they attempted to introduce in evidence that I haven't ruled on, or you didn't agree to, except for the documents concerning the criminal records? I think everything else was admitted to and/or agreed to. Very well, the evidence will be received.

**MR. ZUCKER:** May I list them for the record or do you want to just leave it at that, Your Honor?

**THE COURT:** Well, it is in the record whatever was in.

**MR. ZUCKER:** Yes. Well, the deposition designations, for example, were not referenced by number, but we were planning to substitute them in the binders for -- for the numerical designations that are in there at this point. And everything else was referenced by number, Your Honor.

(N.T. 10/4/16 pgs. 176-177)

No objection was made by any party to Plaintiff's exhibits being received into evidence at the conclusion of his case. *Id.* The same protocol was followed during the cases of defendants Jana Paley, Superior Moving & Storage Company, Inc., and Joel Moranz. All admissible evidence previously identified and not objected to was received into evidence. In the handling of the exhibits all trial counsel acted in a spirit of collegiality.

On October 21, 2016, the Court found in favor of Plaintiff and against Defendants Paley and Superior and in favor of Defendant Moranz and against Plaintiff. The Court issued its Findings of Fact and Conclusions of Law, wherein evidence from the disputed exhibits were explicitly referenced. Subsequently, post-trial motions were filed and oral argument was held before the Court.[1] Among the 481 paragraphs of Defendant Paley's motion for post-trial relief there were no objections to the Court's reliance on the disputed exhibits in its Findings of Fact and Conclusions of Law. In fact references to the disputed exhibits were offered in support of

---

[1] Prior to the filing of Defendant Paley's post-trial motion her new counsel, Jeffrey B. McCarron, Esq. and Candidus K. Dougherty, Esq., entered their appearance.

her motion. *See e.g. Defendant Jana Paley's Brief in Support of Post-Trial Motion* pg. 32 (citing 16 disputed exhibits).

Post-trial motions were denied and on March 2, 2017, defendants Paley and Superior filed the instant appeals. The Court issued an order directing the parties to file statements of error complained of on appeal and these statements were filed. Neither of the appellants alleged any error concerning the exhibits received by the Court. On April 28, 2017, the Court issued its opinion.

On May 16, 2017, the Court was advised by Mr. Zucker that no trial exhibits or transcripts had been transmitted to the Superior Court. Further investigation by Court staff revealed that the "original" binders for Plaintiff Hadley and Defendant Paley's exhibits and the DVD of Paley's deposition submitted to the Court were missing.[2] The Court therefore endeavored to assemble the record and assure its completeness and accuracy. The Court ultimately forwarded documents found in several of the identical binders which were provided to the Court on the first day of trial and a copy of the original DVD it already had in its possession. Because not all of the documents contained in the exhibit binders were admitted into evidence, a number of exhibits had to be removed.[3] To expedite the process Counsel for Plaintiff and for Defendant Superior offered assistance to the Court in identifying which of the materials in the Court's possession were in the record and to this end sent lists of their own exhibits to be sent to Superior Court. In the case of the Plaintiff, a list was provided indicating each place in the trial transcript an exhibit was referenced. Plaintiff and Defendant Superior provided lists only of the

---

[2] As explained previously, the binders of exhibits submitted by the parties contained no original documents, but rather print-outs of electronic documents such as emails and photocopies of paper documents such as court filings. The materials forwarded by the Court to the Superior Court were in all material respects the same as the materials viewed by the Court during the trial.

[3] The undersigned judge's law clerk included along with this material the original indices found in the binders submitted to the Court with the omitted exhibits crossed out in pen. These indices are not exhibits.

4

exhibits they had introduced, however, and Defendant Paley declined to provide any list of exhibits. Defendant Joel Moranz, who is not a party to these appeals, also did not provide a list. Plaintiff Hadley and Defendant Superior's lists were used as aids while the Court conducted a review of the record and compiled the necessary exhibits. The Court regarded the collecting and forwarding of the admitted documents to the Superior Court as an administrative task rather than an adversarial legal proceeding.

In the course of the process described above appellate counsel for Defendant Paley, Jeffrey B. McCarron, Esq., sent several emails directed to opposing counsel which were forwarded to the undersigned judge's law clerk. In these emails Mr. McCarron apparently objected to any exhibits being sent to Superior Court, implying that no exhibits had actually been admitted into evidence. The basis of this claim was unknown to the Court. No objections regarding any specific exhibits were made at this time either to opposing counsel or to the Court by way of motion or email or any other form of communication. In any event the Court conducted an independent review of the record precisely for the purpose of assuring that all admitted exhibits were included in the supplemental record.

On June 14, 2017, the Court forwarded a supplemental record to the Superior Court containing the following items: (1) numbered exhibits admitted to the Court submitted by Plaintiff and Defendants, (2) a copy of a DVD containing a videotaped deposition of Defendant Jana Paley that was played to the Court, and (3) a collection of deposition transcripts. In the case of Defendant Superior's exhibits, the Court provided the prothonotary with photocopies of these documents which were provided by counsel for Superior in an email to the Court. The "originals" provided to the Court with exhibit labels affixed were also photocopies of the original

5

documents. In the case of the DVD, the Court forwarded a substitute DVD that had been previously provided to the Court.

This matter is now before the Court on remand, pursuant to Superior Court's order of August 3, 2017, directing the Court to "certify and transmit the certified record… containing any of the requested exhibits referenced in the Appellant's application, that the trial Court deems necessary and relevant to allow for a complete and judicious assessment of the issues raised on appeal…" The application referred to is the application for remand filed by Defendant Paley. This order is issued pursuant to Pa.R.A.P. 1926, which provides in pertinent part that the appellate court may direct that anything material omitted from or misstated in the record be corrected and that a supplemental record be certified and transmitted if necessary. The Court also has before it motions filed by Plaintiff Hadley and Defendants Paley and Superior, also pursuant to rule 1926, to certify the record in the instant matter. All these motions address in essence the merits of Paley's application, referred to by the Superior Court in its remand order.

The Court has reviewed all the relevant materials and conducted a hearing with the parties. As a result of its investigation into the issues raised concerning the exhibits, the Court will forward a supplemental record to the prothonotary of the Superior Court containing complete versions of the exhibits submitted by Defendant Superior. The reason for this substitution is that it appears some of the pages of the Superior exhibits sent in the previous supplemental record were missing. The Court will also include the DVD of Defendant Paley's deposition that was played in Court and marked and admitted as P-86. The content is identical to that of the DVD previously transmitted to the Superior Court, but the existence of the physical disc itself helps resolve the dispute between the parties as to whether the disc was admitted as an exhibit. Finally, the Court will forward one exhibit that was inadvertently excluded. Two

6

exhibits that were inadvertently sent to the prothonotary are noted below. The Court otherwise certifies that all other exhibits previously forwarded to the Superior Court are the exhibits presented to the Court and were admitted into evidence. The Court also certifies that replacement copies of Superior's exhibits and the DVD of Defendant Paley's deposition are the exhibits that were admitted in this case.

Defendant Paley in her filings has raised numerous additional objections to the record previously forwarded to the Superior Court. Most importantly, Defendant Paley has asserted the majority of Plaintiff's exhibits accepted by the Court in this case were not in evidence and thus should not have been included in the supplemental record. The basis of this claim is in essence an objection to the Court's protocol, described above, allowing exhibits to be identified during the course of trial and viewed by the Court unless a party interposed an objection, and to the Court's subsequent admission of Plaintiff's exhibits *en masse* without identification of each exhibit by number. As recounted above, this procedure was agreed to by all parties and no objection was made to it at any time. Defendant Paley followed this procedure at trial and clearly regarded the exhibits admitted pursuant to the procedure as in evidence. When the time came to assemble the supplementary record and counsel for Plaintiff Hadley and Defendant Superior made explicit their suggestion to the Court that the exhibits admitted pursuant to the Court's protocol be forwarded to the Superior Court, no cognizable objections were made to any particular exhibits. Any objection to the Court's protocol is waived.

Paley also asserts the record fails to adequately disclose which exhibits were actually admitted under the Court's protocol. The record speaks for itself, but the Court will address several specific issues. At the conclusion of her case trial counsel for Defendant Paley, Steven G. Leventhal, Esq., identified by number several exhibits that he wished to move into evidence

7

and was then asked by Mr. Zucker to repeat the list. Either because Mr. Leventhal misspoke, or because he was misunderstood by the court reporter, the transcript shows an inconsistency in the two lists of exhibits. Mr. Leventhal first identified D-9, 14, 18, 31, 38, 49, 55 as the exhibits he wished to move. When asked to repeat himself, Mr. Leventhal moved for the admission of D-9, 14, 18, 21, 33, 38, 49, 54 and 55. (N.T. 10/5/16 pgs. 114-115). The Court resolved this inconsistency by consulting the record. The transcripts reflect that all of the exhibits referenced by Leventhal in his second statement were referenced during the trial and they were admitted. D-31 was never referenced during trial and the Court regarded the reference to D-31 in Mr. Leventhal's first list to be a mistake. Two exhibits that were referenced during trial and not included, D-29 and D-56, were used only during cross-examination and never moved for admission and were not received into evidence by the Court.

Exhibits D-61 and P-83 were identified and admitted but were not forwarded to the Superior Court because they are identical to exhibits P-32 and D-24, respectively. Exhibits D-32 and D-37 were referenced during Moranz's case by Mr. Leventhal during cross-examination and not moved into evidence at the close of his case. They should not have been forwarded to the Superior Court.

The transcript shows P-79 was identified and moved into evidence by Defendant Moranz, although the Court reporter apparently mistakenly noted P-77 was the exhibit received. Only P-79 was admitted. It was, however, mistakenly not included in the Court's supplemental record, and will now be forwarded with the Court's new supplemental record.

Paley has specifically objected to the admission of P-2, alleging it does not match the description provided on the record and thus its authenticity cannot be assured. P-2 and all other exhibits forwarded to the Superior Court are the exhibits that were received into evidence. Their

8

contents have been known to the parties since trial was held one year ago. Any objection to their contents has been waived. Defendant Paley also objects to the content of exhibits P-41, 43, 44, and 45. There were no objections at trial to the admission of these exhibits and it is too late for the Court to entertain any.

Defendant Paley further objects to the inclusion in the record of the DVD recording of Jana Paley's videotaped deposition because, as the transcript reflects, when the DVD was played for the Court it was on several occasions stopped and fast-forwarded to avoid material that had been subject to an objection. However, this does not affect the admissibility of the underlying testimony that the DVD reflects. The portions of the DVD that were to be played for the Court were subject to agreement by counsel. All counsel affirmed to the Court they were aware of which portions of the DVD would be played for the Court. (N.T. 9/30/16 pg. 5). No party objected to the fact that the video was not transcribed by the Court reporter. The DVD itself was marked and admitted as an exhibit. Although identical to the copy transmitted to the Superior Court, the original DVD bearing the sticker "Exhibit 86" has been located and will be forwarded along with the supplemental record.

Finally, Paley objects to the inclusion in the record of a complete set of depositions wherein only certain portions were designated and read into the record. The only significance of these transcripts is their existence. The transcript reflects which portions were heard by the Court.

For the foregoing reasons, the Court will transmit to the Superior Court a supplemental record containing complete copies of D-Superior 2, 3, and 4, the original copy of the deposition DVD (P-86) and the inadvertently omitted P-79. Apart from exhibits D-32 and D-37, which was

9

mistakenly sent, the Court certifies that all other exhibits previously sent to the prothonotary were received into evidence and are authentic.

**BY THE COURT:**

**October 3, 2017**

**Gene D. Cohen,** **J.**

10